**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>COMPASS, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**28 U.S.C. §§ 2201–2202** |

Plaintiff California Regional Multiple Listing Service, Inc. ("CRMLS") respectfully states the following claims for declaratory and injunctive relief against Defendant Compass, Inc. ("Compass").

## PRELIMINARY STATEMENT

This case concerns the efforts of Compass—the largest real estate brokerage in the United States—to bully the real estate industry into abandoning rules designed to promote transparency, broad consumer access, and fair competition among brokerages. At issue are rules that serve a straightforward purpose: if a seller authorizes their agent to seek buyers from outside the brokerage, all brokerages participating in the multiple listing service ("MLS") cooperative—not just one—should have the opportunity to connect their buyer clients with that property. Compass, however, seeks to dismantle these rules so that it can pursue its stated corporate strategy of controlling for-sale property inventory as a competitive weapon—publicly marketing properties to attract buyers while withholding those same properties from the MLS cooperative whose data Compass uses to service its own clients. In short, Compass wants to free-ride on the comprehensive listing contributions of thousands of cooperating brokerages while hoarding its own inventory for its exclusive financial benefit. Having already sued others in pursuit of this agenda, and having sent demand letters threatening additional litigation, Compass now threatens to sue CRMLS unless it capitulates to Compass's demands by October 6, 2026. CRMLS brings this declaratory judgment action to establish that its Cooperation Rules are lawful under federal and state antitrust law because they cause no anticompetitive harm, and are in fact widely recognized as procompetitive.

## NATURE OF THE ACTION

1. This civil action seeks declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. CRMLS brings this action to obtain a judicial declaration that its Cooperation Rules, defined below, governing the submission, access, use, and distribution of the CRMLS listing records are lawful under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq. The Cooperation Rules ensure that CRMLS listings, which contain contributions from its subscribers, provide transparency and access for subscribers and their consumers, promote cooperation amongst participating brokerage firms in CRMLS, and create reasonable parameters to prevent free riding by recalcitrant brokers and/or agents. CRMLS' rules provide for more vibrant competition amongst all participating brokerage firms and importantly provide for an efficient and transparent real estate marketplace that benefits all consumers, whether they are a seller or a buyer.

2. CRMLS is one of the largest MLSs in the United States, with approximately 94,000 real estate professional subscribers and an additional 50,000 agents and appraisers who participate in competing MLSs across California, who have direct access to CRMLS listing records via data share agreements between CRMLS and those competing MLSs.

3. CRMLS operates a broker cooperative that provides a real property information-sharing platform and distribution system that enables real estate brokers and agents to input and search for properties that are for sale, and to research CRMLS listing records to provide opinions (such as on the value of a home), make recommendations for their clients, and provide various consulting services to their clients. Using CRMLS listing records, subscribers can recommend information about the home selling process, including decisions on listing price which then helps

to connect home sellers with the broadest possible pool of informed and knowledgeable prospective buyers. The CRMLS broker cooperative ensures that agents and the consumers they represent have access to up-to-date, comprehensive, and transparent housing market data.

4. This action arises from a formal demand letter, dated September 8, 2026 (the "Demand Letter"), sent by outside counsel for Compass to Art Carter, CRMLS's Chief Executive Officer. *See* Exhibit A (Demand Letter). In the Demand Letter, Compass threatened to bring a federal antitrust lawsuit against CRMLS, and unnamed other MLSs, unless CRMLS confirmed, by October 6, 2026, that it would cease enforcing its Rule 7.9. That rule governs the submission of for-sale properties to the CRMLS cooperative when the listing broker has an exclusive commission agreement with the seller preventing any *buyer agent* from accessing or communicating with that seller. Pursuant to Rule 7.9, submission of the for-sale property for cooperation to CRMLS is triggered upon the public marketing of the property. CRMLS also provides an additional seller option, Rule 7.9.1, called the "No Cooperation Listing," which allows the exclusive agent to "not cooperate with the other subscribers of CRMLS" by withholding the for-sale property from submission for cooperation. While some mistakenly refer to such a listing as an "office exclusive" listing, this phrase is difficult to justify since virtually all listings are subject to exclusive commission agreements, and the entire dispute here concerns marketing a for-sale property *outside of the exclusive broker's real estate office*. CRMLS Rules 7.9 and 7.9.1 are attached as Exhibit B and shall be referenced collectively as the "Cooperation Rules".

5. In short, the Cooperation Rules are straightforward: they require that when a broker publicly markets a property for sale—through yard signs, websites, social media, flyers, or similar means—that property must also be submitted to the MLS for cooperation with other

participating brokers. At the same time, the rules preserve the option for sellers and their brokers to market properties exclusively within a single brokerage as "No Cooperation Listings" (what Compass refers to as "office exclusives") without any obligation to submit to the MLS. The rules thus give sellers and brokers a clear choice: keep a listing entirely within one brokerage, or market it publicly to the broader world. What the rules do not permit is having it both ways—publicly marketing a property to attract buyers while simultaneously withholding that property from the MLS cooperative and the thousands of other brokers and their buyer clients who participate in it and who do actually share their listings with the MLS cooperative.

6. The practical effect of what Compass seeks is to have its "cake and eat it too." Compass wants to access and use the comprehensive listing data that CRMLS compiles from the contributions of thousands of cooperating brokers—data Compass uses to develop comparative market analyses, advise clients, and compete for business—while simultaneously withholding its own publicly marketed listings from that same cooperative pool. In other words, Compass wants to free-ride on the listing contributions of every other participating brokerage while hoarding its own inventory to gain an unfair competitive advantage. If Compass prevails, the result would be a two-tiered marketplace: smaller brokerages that play by the rules and share their listings, and giant brokerages like Compass that take from the cooperative without giving back.

7. At the heart of this dispute is the very essence of a multiple listing service cooperative where real estate brokers share information about properties for sale so that any broker, regardless of size, can match any buyer with any available property. The MLS exists because brokers agreed to pool their listing information: each broker contributes its listings in exchange for access to everyone else's. This "give-to-get" arrangement is what makes the MLS work. Without it, brokers and buyers would be left with what economists call a "hoot-and-holler"

system-calling around to individual brokerages one by one to find out what properties might be available-which would dramatically increase the time, effort, and cost of every real estate transaction and ultimately make brokerage services and houses less affordable for consumers. The rules at issue here simply enforce this foundational bargain: if a broker publicly markets a property to attract buyers, that broker must also share the listing with the MLS so all participating brokers and their clients can see it.

8. Compass's Demand Letter was copied to the Antitrust Division of the U.S. Department of Justice and the Bureau of Competition of the Federal Trade Commission.

9. The CEO of Compass, Robert Reffkin, backed up those threats of litigation during the recent Council of Multiple Listing Services conference, in Fort Lauderdale, Florida. On September 30, 2026, during an interview in front of a packed room of over 900 attendees, Mr. Reffkin stated unequivocally, that Compass would begin filing lawsuits against MLSs across the country in mid-October if they fail to commit by October 6, 2026, to stop fining Compass agents for publicly marketing No Cooperation Listings (which he mistakenly referred to as "office exclusives").

10. Compass's threatened claims are meritless. The CRMLS' Cooperation Rules are procompetitive and have been in effect since May 2020 and serve the fundamental purpose for which MLSs were created: ensuring that publicly marketed residential real estate listings subject to exclusive commission agreements are broadly shared and accessible to both participating agents and their consumers, and to ensure that home sellers receive maximum exposure and home buyers have access to the most comprehensive inventory of available properties. In short, the Cooperation Rules ensure transparency, access, and competition in the real estate marketplace,

and prevent free riding by brokers and agents that use the CRMLS listing records to obtain new or service existing clients.

11. The Cooperation Rules require that: "Within one (1) business day of marketing or advertising a residential property to any member of the public for sale which contains one to four units, or is a residential vacant land lot which is subject to any exclusive right to sell or seller reserved listing agreement, the Listing Broker must submit the property into the MLS for cooperation with other CRMLS participants." (*See* Exhibit B, Rule 7.9).

12. Rule 7.9, however, preserves sellers' ability to share and communicate the existence of for-sale properties publicly without submitting their property to CRMLS while protecting the seller from the negative impacts of an exclusive commission agreement which would limit that seller's opportunity or choices to interact with a different agent that may represent an interested buyer. The Cooperation Rules also provide the additional seller choice of allowing an exclusively retained broker to communicate and share the property with that firm's customers and clients as a "No Cooperation Listing" without any obligation to list those properties on the MLS. (*See* Exhibit B, Rule 7.9.1) Rule 7.9 only requires that once a seller's broker *publicly* markets a property—through flyers, yard signs, digital marketing on public-facing websites, email blasts to consumers, multi-brokerage listing sharing networks, or similar means—the for-sale property information must also be submitted to the MLS for cooperation so that all cooperating buyer agents and their buyer consumers and clients have full and fair access to the for-sale information, and an opportunity to see and buy the home. The purpose and premise of Rule 7.9 is simple and direct: If the seller has authorized their own agent to seek a buyer from outside the seller agent's brokerage firm, then all other brokerage firms (and their agents) participating in

CRMLS cooperative should have the opportunity to represent a buyer in pursuing a purchase of that for-sale property.

13. CRMLS responded to the Compass Demand Letter citing its concern that capitulating to Compass's demands could result in potential antitrust claims being asserted by buyers and their brokers against CRMLS. In late 2024, Compass made similar demands, to which CRMLS refused to capitulate, again citing antitrust concerns from buyers and buyer's brokers. The CRMLS response to both demands of Compass are attached as Exhibits C and E. Compass's recent public statements, as well as other lawsuits Compass has filed, demonstrate the threats are not hollow, and the dispute between the parties is ripe for judicial determination.

14. CRMLS seeks a declaration from this Court that the Cooperation Rules and its requirement that a for-sale property subject to an exclusive commission agreement be submitted to CRMLS for cooperation with the other participants of CRMLS upon public marketing are lawful under federal and California antitrust law, and an injunction preventing Compass from pursuing the threatened antitrust claims.

## **THE PARTIES**

15. Plaintiff CRMLS is a California mutual benefit corporation with its principal place of business in Chino Hills, California. CRMLS is one of the largest MLSs in the United States, serving over 94,000 real estate professionals, including brokers and agents, across sixteen California counties. CRMLS operates a broker cooperative that provides a real property information-sharing platform and distribution system that enables real estate brokers and agents to input and search for properties that are for sale, and to research CRMLS listing and sale records so as to provide opinions and consulting services to their clients. Subscribers use the CRMLS

listing records to share real estate listing information, develop opinions and make recommendations for their clients.

16. Defendant Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is a publicly traded company, and the largest real estate brokerage in the United States. Compass employs thousands of real estate agents nationwide, including in California and New York, and is a participant in CRMLS.

## **JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because Compass' threatened action presents a substantial question of federal antitrust law under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court also has supplemental jurisdiction over CRMLS's state law claims under 28 U.S.C. § 1367.

18. An actual, justiciable controversy exists between CRMLS and Compass. Compass's September 8, 2026 Demand Letter explicitly threatened federal antitrust litigation against CRMLS unless CRMLS capitulated to Compass's demands by October 6, 2026. The Demand Letter set forth specific legal theories under which Compass claimed the Cooperation Rules violate the Sherman Act. On September 30, 2026, CRMLS responded citing its concerns that agreeing to the rule changes in the Compass Demand Letters would potentially cause CRMLS to be in violation of various antitrust laws. The dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

19. This Court has personal jurisdiction over Compass because it is incorporated in Delaware and has its principal place of business in New York, New York. Compass is therefore subject to general personal jurisdiction in this District. In addition, Compass conducts substantial

business in New York, employs agents who operate in this District, and directed its Demand Letter to CRMLS with the knowledge that the threatened litigation would affect interstate commerce, including commerce in this District.

20. Venue is proper in this District under 28 U.S.C. § 1391(b) and under section 12 of the Clayton Act, 15 U.S.C. § 22, because Compass resides in this District, a substantial part of the events giving rise to the claims occurred in this District, Compass may be found in this District and transacts business in this District.

## FACTUAL BACKGROUND

### A. CRMLS, the Multiple Listing Service System, and Brokerages

21. A multiple listing service is a network of real estate professionals (including agents, appraisers, and other subscribers) that agree to cooperate with each other by following the reasonable rules of the cooperative to timely and comprehensively share all the details and access to properties that are for sale or rent, including closing transactional information, resulting in an efficient, fair and equitable marketplace to benefit their clients. The MLS system has been a cornerstone of the American residential real estate market for more than a century, enabling the efficient matching of home sellers with home buyers.

22. The MLS serves an essential market-making function. As the Federal Trade Commission recognized in its 1983 study of the residential real estate brokerage industry (the "Butters Report"), "both sellers and buyers would be served best if they could reach *all potential buyers* or receive information relating to all homes for sale, through a single, convenient source." (emphasis added) The Butters Report found that the MLS "creates [an] excellent centralized source of information regarding housing values" and that the "market-making effect of the MLSs

probably exceeded even the founders' expectations." *See* FTC, The Residential Real Estate Brokerage Industry (1983) , at 11, 113.

23. Even before the incredible advances in technology and the internet, the 1983 Butters Report further found that the MLS doubles the probability of a property selling and is "essential to most brokers in order to market their properties efficiently." *Id* at 128. These findings confirm that the MLS is a procompetitive institution that benefits consumers on both sides of the real estate transaction—both home sellers and home buyers.

24. In 2007, in the FTC and DOJ's joint report, entitled "Competition in the Real Estate Brokerage Industry" (the "2007 Competition Report"), the agencies both recognized that "[m]ost MLSs *require* that a member broker, upon acceptance of a listing, *enter the listing into the MLS database within a short period of time, e.g., twenty-four to seventy-two hours*." 2007 Competition Report at 11 (emphasis added). At no point in the 2007 Competition Report did the agencies state that such a mandatory submission rule was anti-competitive or unfair to participating brokerage firms.

25. To the contrary, later in the 2007 Competition Report, the agencies acknowledged the importance of the MLS to not just sellers and their exclusive agents, but also to buyers and other brokers. Specifically, the agencies stated that buyers benefit from the MLS because they can have access to "a single source (that is, a single broker) for information regarding the vast majority of homes for sale within a given area, instead of visiting multiple brokerages to obtain such information. Access to the largest number of potentially appropriate homes for sale allows buyers to maximize their chances of finding a home that most clearly matches their shared characteristics." *Id.* at 12 (citation omitted).

26. As the agencies readily acknowledged in the 2007 Competition Report, "[t]he efficiencies associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature." *Id.* at 13 (citation omitted).

27. CRMLS values the vital market-making and efficiency enhancing role it plays in the real estate marketplace, and seeks to ensure that its rules balance the benefits for all sellers, buyers, exclusive listing brokers, and cooperating brokers representing buyers. In addition, as noted above, in addition to serving 94,000 real estate professionals across California that have subscribed, CRMLS also provides access to its full data set to a number of competing MLSs so that their additional 50,000 agents benefit from access to the CRMLS listing records. Indeed, CRMLS's database contains tens of thousands of active listings and has over six million individual MLS listing records which constitutes the most comprehensive source of residential real estate market data in its service area. CRMLS enables its participants to provide their clients—home sellers and home buyers alike—with access to the most complete and accurate information about properties available for sale, and past transaction data. CRMLS also provides access to licensed real estate appraisers to use the timely and comprehensive MLS listing records to prepare property appraisals for both consumers and lenders—further facilitating the completion of real estate transactions. Furthermore, CRMLS licenses the CRMLS listing records for use by its participants in the operations of the brokerage's back-end office systems, for which Compass holds such a license. The CRMLS listing records are also licensed to entities that support real estate transactions and need access to timely and accurate real estate transaction records such as lending institutions, Fannie Mae, Freddie Mac, FHA, VA, appraisal review companies, and insurance companies. The support provided by these entities is critical to the speedy due diligence and closing of sales that support those cooperating brokers that use CRMLS.

28. CRMLS operates as a cooperative venture. Its participants—competing brokerages and agents—contribute information and media about for-sale property, which is combined with real property information and the intellectual property of CRMLS to create an MLS listing record. All participating brokerages contribute their for-sale property information to the shared platform in exchange for the reciprocal benefit of access and use of those MLS listing records contributed by other cooperating participants. The value of CRMLS depends on the timeliness, breadth and completeness of its data; the greater the timeliness and accuracy of the MLS listing records shared on the platform, the more useful the platform is to every participant and every consumer those participants serve.

29. That said, CRMLS faces extensive and vigorous competition from other regional MLSs that also operate in overlapping service areas. Indeed, to the south, San Diego MLS operates a successful and competitive MLS, and in the Los Angeles and Westside areas, for decades, CLAW has also operated a competing MLS. CRMLS welcomes this competition, and even supports both SDMLS and CLAW by entering into reciprocal data-sharing agreements to provide those two MLSs with access to listings available on CRMLS. Furthermore, to the north MLSListings and BridgeMLS, which operate in the Silicon Valley and the Oakland areas of California, also receive access to all MLS listing records from CRMLS.

30. Turning to the subscribers to the MLS, residential real estate brokerage firms take on oversight and legal responsibility for agents, providing agents with training, tools, and marketing materials, among other services. Traditionally, agents are not employees of their brokerages but, instead, operate as independent contractors.

31. Compass is the largest real estate brokerage firm in the United States. It was originally founded in 2012 and, upon information and belief, grew quickly by paying highly

productive agents and teams working for competing brokers large bonuses to abandon their existing brokerage firms to join Compass. Compass' growth then continued via numerous mergers and acquisitions of their competing brokerage firms. In quarterly earnings reports Compass has continually asserted that its size and continued growth provide it a competitive advantage in the market by controlling the inventory of for-sale properties. In a Q4 2024 Earnings Call on Feb. 18, 2025 CEO Robert Reffkin stated: "Depth of inventory, not breadth" is what will set Compass apart from its competitors, and he went on to state: "By growing our unique inventory and marrying that with our end-to-end platform, which has agent-level search and consumer search at a level that no other brokerage firm in the industry has, we believe that more and more buyers will search Compass.com and use Compass agents, as it will be known that Compass has more inventory than any other website or brokerage." Compass has been a member of CRMLS since 2015, and hiding for-sale properties from CRMLS and from its cooperating brokers and agents to force their clients to instead use a Compass agent is a specific and stated goal of Compass.

32. Across the country, Compass operates real estate brokerage businesses with over 33,000 Compass real estate agents. Following Compass's January 2026 completion of its acquisition of Anywhere Real Estate Inc., Compass currently operates a brokerage firm of about 83,000 agents (Compass and Coldwell Banker combined) and a U.S. franchise business that has more than 126,000 real estate agents in their franchisee system.

33. Compass earns revenue by collecting a share of the gross sales commissions that its affiliated agents earn from home sales when representing either the buyer or seller of a home. In 2025, Compass reported closing 250,360 residential real estate transactions for a gross transaction value of $267 billion—by far the largest brokerage firm in the country.

34. Compass is in the process of implementing a nationwide and branded "3-Phased Marketing Strategy." The three phases include:

a. Compass Private Exclusive: In phase 1, the seller and agent privately market the property to other agents and their clients. Just as many companies test products with a smaller audience before launch, listing a home as a Private Exclusive allows a seller to test price, gain critical insights, and generate early demand before going public.

b. Compass Coming Soon: In phase 2, the listing moves to "Coming Soon" status and is publicly launched on Compass.com, showcasing it to all agents and consumers without displaying days on market, price drop history, or other negative insights. This is a signal to prospective buyers that increased competition for the listing will be coming soon when it is launched on all other sites, and it provides another chance for the seller and agent to collect valuable feedback.

c. Active on MLS and Home Search Portals: The final phase is going active on the MLS and third-party sites, now armed with the benefit of price discovery and other information gained from Phases 1 & 2. With the listing live on the MLS and third-party sites, it will, for the first time, accrue days on market, visible price drop history, and other negative insights created by platforms like Zillow.

Complaint, *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA(S.D.N.Y.), Dkt. No. 15 ¶ 57.

**B. NAR's Clear Cooperation Policy and Its Procompetitive Purposes**

35. On November 11, 2019, the National Association of Realtors ("NAR") adopted the Clear Cooperation Policy as MLS Statement 8.0. CRMLS subsequently adopted and implemented the Cooperation Rules as part of its MLS rules implementing the NAR policy.

36. The NAR Clear Cooperation Policy provides: "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." Public marketing is defined to include, among other things, "flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public."

37. CRMLS Rule 7.9 implements NAR's Cooperation Rules, stating similarly, "Within one (1) business day of marketing or advertising residential property to any member of the public for sale which contains one to four units, …. the listing broker must submit the property into the MLS for cooperation with other CRMLS participants." According to CRMLS Rule 7.9, "Marketing and advertising includes, but is not limited to, . . . : signs, websites, social media, brokerage or franchise listing sharing networks, flyers or written material, on any applications, or by conducting an open house." (*See* Exhibit B)

38. Among other key issues, the Cooperation Rules address a critical free-rider problem that threatened to undermine the entire cooperative structure of the MLS. Before the Cooperation Rules, some brokerages were accessing the comprehensive listing data provided by MLS participants while simultaneously withholding their own listings from the MLS, including many listings which were publicly marketed outside of the MLS but not accessible to all other participating brokers, as well as consumers. In 2018 alone, over 9,000 for-sale properties were marketed to the public before being submitted for cooperation to CRMLS. This practice allowed certain brokerages to benefit from the cooperative data pool without contributing to it, thereby degrading the value of the key service CRMLS provided for all other participants and the

consumers they serve. Throughout 2019, CRMLS received weekly complaints from buyer agent subscribers that inquired about for-sale properties to the non-cooperating advertising agent, but failed to receive any response. In short, those non-cooperating agents were hoarding their listings, while still benefiting unfairly from the listings of the cooperative. In some cases, the advertising listing agent would respond, but would require the inquiring buyer agent to refer the potential buyer client over to the adverting seller's agent in exchange for a referral fee, and if the buyer's agent refused, the advertising seller agent would refuse to deal. Buyer agents complained to CRMLS that their buyer clients were forced to abandon their representation and engage with the advertising seller's agent as the only way for the buyer to gain information or access to the for-sale property. These buyer agents questioned if they should continue to use the CRMLS cooperative if CRMLS failed to enforce rules that would protect the concepts and principles of cooperation in a practical and meaningful way.

39. As the *Compass v. Zillow* court recognized, such practices could "degrade [a platform's] ability to obtain fresh, comprehensive, and accurate listings; encourage freeriding; fragment the real estate market; and limit transparency." *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Op. and Order, Dkt. No. 184 at 13-14.

40. The Cooperation Rules do not result in any harm to competition, which is required to bring any Section 1 claim, as Compass threatens.

41. In fact, the Cooperation Rules serve several important procompetitive purposes:

a) Market Transparency and Information Quality. By requiring that publicly marketed listings be promptly submitted to the MLS, the Cooperation Rules reduce hidden inventory and improves the completeness, accuracy, and timeliness of market information available to all participants and consumers. This transparency benefits both buyers, who gain

access to a fuller picture of available properties, and sellers, who benefit from the most efficient pricing mechanism. In addition, sellers also benefit by ensuring the broadest potential access to their property and providing assurance that they are likely receiving the best possible price for their property—as even the Butters Report confirmed over 40 years ago. In addition, this market transparency and information quality benefits brokers representing (or seeking to represent) sellers, and buyers. First, competing selling brokers can access the MLS comprehensive database of listing information and determine the most accurate potential pricing and marketing plan for a property, thus helping them obtain potential seller representations. While brokers representing buyers (as noted in the 2007 Competition Report) can compete effectively for buyers knowing that they can provide access to the full complement of MLS listing information and advise their potential buyers knowing that they have access to the vast majority of available listings in the MLS. By accessing the MLS, even a sole proprietor brokerage can obtain access to the entire inventory of listings in the same way that agents at the largest brokerage can, thus ensuring consumers have choice of which brokerages they want to employ.

b) Increased Output and Broader Access. The Cooperation Rules increase the output of the MLS by ensuring that publicly marketed listings are available to all participants. This broader access means more buyers see more listings, leading to more efficient matches between buyers and sellers and ultimately to more completed transactions.

c) Preservation of the Cooperative Product. The MLS depends on the broad, prompt contribution of listing data by its participants—indeed, like many other efficiency enhancing products, the MLS depends on the network effect of having all participating brokers submitting their listings in accordance with the established rules and regulations of the MLS. Without the Cooperation Rules, the value of the MLS would degrade as participants withhold publicly

marketed listings, transforming the MLS from a comprehensive marketplace into an incomplete and unreliable data source.

d) Prevention of Free-Riding. Brokers who access MLS data to identify buyers while withholding their own publicly marketed listings from the MLS are free-riding on the contributions of other participants. The Cooperation Rules prevent this free-riding by requiring that the benefits of the cooperative system flow in both directions. Thus, the Cooperation Rules prevents a brokerage from obtaining access to all other cooperating brokerages listing information, while at the same time refusing to share their listing information to the balance of the cooperative. For example, brokers access CRMLS data to develop and create comparative market analyses (CMA) for potential sellers by using the MLS listing records of past sales and current for-sale properties (including access to on average 34 photos per listing), and detailed sales information (like closed sale price, dates related to marketing time, and information about provided concessions to compare to the home that they trying to value). Brokers then use the CMA to convince a seller to retain their services and recommend pricing and advice on timing and other transactional elements impacting the seller. The Cooperation Rules thus prevent non-cooperating brokers from benefitting from the fruits of the labor of the cooperative, but refusing to submit their own listing information, which those other brokers then cannot incorporate into their CMAs—in short, the non-cooperating broker has an unfair information advantage by refusing to abide by the Cooperation Rules.

e) More vigorous competition amongst competing, participating brokerage firms. Regardless of the size of the firm, brokers participating in the MLS are able to service any potential buyer because they maintain access to the vast majority of inventory in a service area. As a result, brokers representing buyers are forced to compete on the quality of their skills,

experience and, critically, *on pricing*, rather than buyers being forced to use a specific broker just to gain access to information or to gain access to see a specific property. Moreover, because of the Cooperation Rules, brokers participating in the MLS reduce the costs of matching a potential buyer to a potential seller, and can market their services to a large set of potential customers.

f) Consumer protection from superior knowledge, information and influence of broker. Hiding a for-sale property from the MLS allows a seller agent to use an exclusive commission agreement to prevent any other competing buyer brokers with interested clients from accessing the for-sale property or its seller. This practice also allows the seller's agent to control advertising, marketing and buyer leads exclusively, which the seller's broker may leverage for their own financial benefit, and to the detriment of the seller. One example is Compass has an exclusive marketing agreement with Redfin.com, where, upon information and belief, Redfin/Rocket provides financial benefits and favored benefits to their horizontal competitor Compass, in exchange for Compass providing any for-sale property advertisements exclusively to Redfin.com. Compass only receives these financial incentives for properties that are not sent by Compass, or the MLS to Zillow.com, Realtor.com, Homes.com or any of the CRMLS distributed websites which total over 22,000. The value Compass extracts come from hiding the for-sale property from these competing sites. The potential buyer views of the for-sale home advertisements are many times greater on the excluded sites than having the for-sale property only available on Redfin.com or Compass.com causing the seller to lose valuable marketing opportunities just so the listing broker can generate additional revenue from hiding the for-sale property from the MLS and competing websites.

42. The procompetitive nature of the Cooperation Rules have been recognized by the market itself. Anywhere Real Estate, Inc., which was the nation's largest real estate holding

company for many years, *and is now also owned by Compass*, warned in its 10-K for fiscal year 2024 that changes to the Cooperation Rules "could, among other things, reduce the availability of broadly listed properties, leading to more unlisted inventory and potentially limiting access to comprehensive housing market data." This acknowledgment by a major industry participant, which is now part of Compass, confirms that the Cooperation Rules serves to maintain market transparency and data quality—core procompetitive values.

43. The MLS is a legitimate cooperative venture, and the Cooperation Rules are internal rules governing the core product of that venture. Under *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), internal decisions of a legitimate joint venture regarding its core product are not subject to *per se* antitrust condemnation. The Cooperation Rules govern the terms on which participants contribute to and benefit from the MLS's cooperative data pool—a quintessential internal venture decision.

**C. Non-Exclusive Listing, "No Cooperation Listings," and Limited Marketing Options**

44. Importantly, CRMLS Rule 7.9 which requires for-sale property submission for cooperation upon public marketing, is limited to only properties subject to an exclusive commission agreement. An exclusive commission agreement prevents any competing agent from interacting with or communicating with a seller under the National Association of Realtors, Code of Ethics Article 16, Standard of Practice 16-13. Under an exclusive agreement it is the fact that a seller's agent will be paid, even if that seller's agent fails to procure the buyer, which provides the necessary incentive and protections for that seller's agent to submit the for-sale property to the MLS cooperative.

45. Brokers may also enter into non-exclusive agreements, where they are only paid compensation from their seller if they procure a buyer for the property. Public marketing of a for-

sale property subject to a non-exclusive agreement protects the seller from an unethical agent that may hide interest and/or inquiries from potential competing buyer agents. With a non-exclusive agreement in place the seller and the seller's agent are subject to the open marketplace, so if the seller's agent refuses to cooperate, refuses to deal or hides the interests of the buyer agent's inquiry from the seller, then the buyer's agent may go to the seller directly and may deal directly with the seller to show the property and present an offer from the buyer agent's client. Rule 7.9 presents a fair balance between exclusive agreements restraining access to the seller being paired with mandatory submission to the MLS for cooperation, and preserving the opportunity if the seller wishes to not use the MLS to market their home, then the seller and their property will not be restrained in the free marketplace.

46. A "No Cooperation Listing" (Rule 7.9.1) is one that is shared entirely within a single brokerage firm, without any public marketing, and without submission to the MLS. A seller who wishes to limit the access of his or her property to a single brokerage, and still wants to sign an exclusive commission agreement, may do so without triggering any obligation under the Cooperation Rules.

47. The existence of both the non-exclusive agreement and No Cooperation Listing options are critical features of the Cooperation Rules. These options ensure that the Cooperation Rules do not compel any seller to list on the MLS. Rather, the Cooperation Rules require that if a seller and broker have an agreement that restrains buyer agents from accessing the seller while choosing to publicly market a property—reaching beyond the brokerage's own agents to the general public—the listing must also be shared on CRMLS so that all participants and their buyer clients can benefit from that information and opportunity.

48. The Cooperation Rules are integral to preventing free riding by agents that want to hoard for-sale inventory for their own profit. If as Compass now demands, a brokerage was permitted to publicly market a No Cooperation Listing (what Compass mistakenly calls an "office exclusive"), without submitting it for cooperation in the MLS, the public marketing of the No Cooperation Listing would swallow the Cooperation Rules, and defeat their procompetitive purposes. Indeed, Compass seeks to have its "cake and eat it too" by claiming that it should be allowed to withhold a No Cooperation Listing from submission to the MLS, but then be free to "publicly market" that listing outside the cooperative—in direct contravention of CRMLS rules.

49. In order to try and accommodate a seller's potential request for non-CRMLS methods of advertising and marketing a property, CRMLS has developed alternative marketing options for sellers.

50. For example, CRMLS has a "Coming Soon" status as an additional option to sellers, which includes submitting the listing to CRMLS for cooperation, but no "days active on the MLS" are accrued. During the Coming Soon status, the property may be publicly marketed, and it is displayed to other participants in CRMLS, but the listing broker volunteers to not show the property to any potential buyers. The "Coming Soon" status allows a seller to market a property, to create buzz and energy around its full access while the seller or listing agent prepare the property for viewing by the public. Since there are no tours or showings to potential buyers, the listing does not accrue "Days Active in MLS." In addition, a property may stay in the "Coming Soon" status for a period of 21 days. Importantly, *all CRMLS users* can see "Coming Soon" listings and are aware that the property may be coming to the marketplace shortly, so the for-sale property is part of the cooperative process.

51. In addition, the "Coming Soon" status provides listing brokers with additional optionality designed to accommodate a potential seller's wishes for limited CRMLS dissemination to third party advertising websites. In fact, a seller instructing their broker to opt for "Coming Soon" status can fill out a form which "limits exposure" of the property on third-party portals, such as Zillow, Realtor.com, Homes.com, Google Mobile App Search, and other public broker and agent websites like Redfin.com and other such sites. As a CRMLS member, Compass is well aware of this option, which allows for "public marketing" that its Demand Letter seeks, but for whatever reason, Compass finds this alternative unsatisfactory, despite the fact *that they previously demanded the status, and then was implemented by the CRMLS board*.

52. Furthermore, CRMLS provides listing brokers with the option of making the listing fully "Active," meaning: the listing is displayed fully in the CRMLS database and fully distributed through IDX and VOW data feeds; "Days Active on the MLS" are counted; and showings of the property are taking place both by the listing broker and any other participant representing a buyer. As expected, all CRMLS users can see "Active" listings.

**D. Compass's Threatened Litigation**

53. On September 8, 2026, Nathan P. Eimer, of Eimer Stahl LLP, acting as counsel for Compass, sent the Demand Letter to Art Carter, the Chief Executive Officer of CRMLS.

54. In the Demand Letter, Compass demanded that CRMLS "stop fining and/or punishing agents for publicly marketing Office Exclusive listings." CRMLS rules have no "office exclusive" category, but CRMLS understood this to mean No Cooperation Listings per Rule 7.9.1. Compass further demanded that CRMLS confirm by October 6, 2026 that it would cease the enforcement of its rules, threatening a federal antitrust lawsuit if CRMLS did not capitulate.

55. Compass's Demand Letter asserted that CRMLS's prohibition on public marketing of No Cooperation Listings (mistakenly referred to by Compass as "office exclusive listings") constitutes a "horizontal agreement among competitors—a group boycott" in violation of the federal antitrust laws. Compass contended that MLS membership is "not voluntary" but rather "a requirement of trade," and argued that CRMLS is "controlling how real estate professionals and homeowners act off of your platform."

56. In the Demand Letter, Compass cited the FTC's Fourteen Points antitrust policy and argued that CRMLS had "returned to the days before the Fourteen Points." Compass further referenced its lawsuit against NWMLS and identified several MLSs that it claimed allow public marketing of office exclusives, including Bay Area REIS, Bright MLS, Garden State MLS, and MetroList.

57. The Demand Letter was copied to the Antitrust Division of the U.S. Department of Justice and the Bureau of Competition of the Federal Trade Commission, and included a document preservation notice—further underscoring Compass's intent to pursue litigation if CRMLS did not accede to its demands.

58. CRMLS responded to the Compass demand letter on September 30, 2026. (*See* Exhibit C).

59. In addition, CRMLS operates a compliance department that processes reports of all manner of CRMLS Rule violations to keep the MLS data as accurate as possible with an average of 25,000 reports annually. Only a small percentage of those reports relate to Rule 7.9-failure to submit a listing upon public marketing. In 2025, CRMLS issued 89 fines for violation of Rule 7.9, with only 8 of those going to a Compass agent. For context, CRMLS had over 271,000 listings enter the system in 2025. To date in 2026, CRMLS has processed approximately

300 cases related to violations of Rule 7.9, with about 75 of those involving a Compass for-sale property. CRMLS has noticed a significant increase in reports against Compass since the spring. As of the date of filing, CRMLS has ten open cases involving Compass agents with eight of those having been appealed by the violating Compass agent. CRMLS had approximately 25 cases where Compass violated Rule 7.9, and for which CRMLS did not issue a fine to Compass. This was in the time period where CRMLS was implementing its new Coming Soon Limited Exposure process, so CRMLS did not issue citations or fines in an effort to assist Compass in the education of their agents to use the new option CRMLS created at Compass's request. Additional reports of Compass advertising for-sale properties while failing to submit those same properties to CRMLS for cooperation continue to be received for future processing.

60. Compass's threatened litigation against CRMLS is part of a broader pattern. Compass had previously demanded that CRMLS remove the Cooperation Rules entirely in 2024. Specifically, in November 2024, Compass demanded that CRMLS remove the Cooperation Rules or face an antitrust lawsuit in January of 2025. (*See* Exhibit D.) CRMLS evaluated the antitrust claims made by Compass and concluded that removing the Cooperation Rules and implementing the rule modifications Compass demanded could subject CRMLS to potential antitrust liability from buyer agents, buyers and to potential intentional misrepresentation claims from sellers. In a lengthy email, dated December 3, 2024, CRMLS rejected Compass's demand to modify the Cooperation Rules and detailed its antitrust concerns arising from CRMLS' potential participating in agreeing to create rules for the benefit of giant brokers and their preferred business model. (See Exhibit E.)

61. The reality and immediacy of this controversy are underscored by Compass's pattern and practice of bringing antitrust claims against MLSs and other parties that maintain rules

similar to CRMLS's Cooperation Rules. Compass recently sued the Northwest Multiple Listing Service ("NWMLS"). *See Compass, Inc. v. Nw. Multiple Listing Serv.*, No. 2:25-cv-00766, 2026 WL 776138 (W.D. Wash. Mar. 19, 2026). NWMLS and Compass ultimately entered a settlement whereby NWMLS agreed to change certain of its rules related to for-sale listing distribution, but not its requirement that before a real estate listing could be publicly marketed, it had to be provided to NWMLS for inclusion for cooperation in its database of available properties. Compass's Demand Letter expressly cited the NWMLS litigation as precedent for its threatened action against CRMLS, but neglected to mention this key provision in its settlement with NWMLS.

62. Additionally, in *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Compass brought antitrust claims against Zillow, Zillow Group, Inc., and Trulia, LLC, alleging that Zillow's Listing Access Standards violated Sections 1 and 2 of the Sherman Act. Compass sought a preliminary injunction to enjoin Zillow's implementation of display standards that excluded from Zillow's platform listings that had previously been advertised and marketed before submission to the local MLS in violation of the Cooperation Rules. That court denied Compass's motion for a preliminary injunction on February 6, 2026, finding that Compass had failed to demonstrate a likelihood of success on the merits of its Section 1 claim and had not made a clear showing that Zillow possessed monopoly power in the online home search market. Compass subsequently dismissed the action.

63. Taken together, these cases and CRMLS' concerns arising from Compass's demands to create rules favorable to giant brokers demonstrate a broad pattern of conduct whereby Compass is engaged in a ceaseless campaign to limit access to residential real estate listings and to force both consumers and brokers to use a Compass-affiliated agent simply to gain access to

information about a for-sale property. In the NWMLS litigation, Compass sought to prevent an MLS from enforcing rules requiring that publicly marketed listings be shared on the MLS. And in the *Compass v. Zillow* litigation, Compass sought to prevent Zillow from implementing listing standards that promoted transparency and access that violated the same principles as the Cooperation Rules. In each case, Compass's conduct was directed at undermining rules or policies designed to ensure transparency and broad access to listing information, and to benefit itself—a giant brokerage with a large inventory of for-sale properties. This pattern underscores the credibility of Compass's threat to bring similar claims against CRMLS and likely other MLSs that received copies of the Demand Letter.

64. In addition, Compass's CEO has recently made public statements and published social media posts—including one stating unequivocally that Compass intended to file a lawsuit against CRMLS concerning the issues raised in this declaratory judgment action.

65. Compass has publicly signaled its intent to pursue similar litigation against other MLSs, including CRMLS. The Demand Letter makes clear that Compass is contemplating litigation against other MLSs across the country. Moreover, upon information and belief, similar Demand Letters were also sent to numerous other MLSs across the country. Upon information and belief, those other Demand Letters included the same threat that each of those MLS cease the enforcement of its rules relating to the submission of "office exclusives" that are publicly marketed, and threatening those MLSs with a federal antitrust lawsuit if they failed to capitulate.

**E. History of Antitrust Enforcement Regarding MLS Rules**

66. The federal government has a long history of engagement with competition issues in the residential real estate industry. The FTC's Fourteen Points, first articulated in 1971, established a framework for evaluating the antitrust implications of MLS rules. The Fourteen

Points addressed concerns that mandatory listing submission rules could restrict the competitive freedom of broker-members, and provided, among other things, that MLSs should not prohibit office exclusives, which CRMLS rules do not prohibit.

67. Published in 1983, the FTC's Butters Report provided a comprehensive analysis of the residential real estate brokerage industry. The Butters Report recognized the procompetitive benefits of the MLS system while also noting that "office exclusives" allowing sellers to withhold listings from the MLS "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings." The Butters Report at 130. The Cooperation Rules' preservation of the "office exclusive" exception is consistent with this insight. CRMLS' specific adoption of "No Cooperation Listings" and the non-exclusive commission agreement options it offers participating brokers implements these policy decisions.

68. The FTC's 1983 Butters Report also highlighted the exact problem with "vest-pocket" listings, which is exactly what Compass now demands of CRMLS by stating: "While there may be cases where a seller does not want his or her listing submitted to the MLS, the MLS remains the most efficient method of maximizing exposure of property in large markets. Historically, however, a common problem for sellers and for the MLSs has been 'vest pocket' listings. An ability to easily withhold underpriced listings may increase the incentives of some brokers to undervalue listings initially. Thus, one rationale for mandatory listing requirements traditionally has been that it helps in suppressing a practice which can do substantial injury to consumers." *Id.* at 130.

69. In 2007, the DOJ and FTC jointly published a report on competition and real estate, further documenting the federal government's engagement with these issues. As noted above, the 2007 Competition Report examined various MLS rules and practices and their effects on

competition, reaffirming the government's recognition that MLS rules can serve procompetitive purposes when properly structured.

70. Indeed, as the *Zillow Group., Inc. v. Midwest Real Estate Data, LLC,* court recently noted, the DOJ's 2008 consent judgment with NAR established an "'objective criteria' requirement" for MLS data feeds, and subsequent DOJ enforcement has focused on ensuring that "NAR's policy requiring listings to be placed immediately into an MLS" does not "restrict competition from alternative brokerage and listing models." No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), Memo. Op. and Order, Dkt. No. 141 at 44. The DOJ's approach confirms that federal enforcement has sought to refine the Cooperation Rules, not eliminate them.

71. Finally, in the Supplemental Statement of Interest it filed in the action, *Nosalek v. MLSpin, et al.*, 1:20-cv-12244-PBS, Dkt. No. 358 at 7 n.2, the DOJ clarified that: "Of note, industry participants have made public statements about the Division's purported position on clear cooperation policies that are misleading and out of context. The Division has not taken a position that such policies standing alone (i.e., without mandated MLS publication of offers of compensation or exceptions benefitting primarily large brokerages) are anticompetitive" (emphasis omitted). CRMLS is informed and believes that this statement from the DOJ was directed at public statements made by Compass. Importantly, CRMLS eliminated "mandated MLS publication of offers of compensation" years ago, and as noted above CRMLS' rules seek to balance the interests of all brokerage firms, large or small, as well as the interests of sellers and buyers. Thus, CRMLS's Rules do not contain the feature surrounding compensation that would raise the stated concerns set forth by the DOJ in the *Nosalek* Statement of Interest.

**F. Prior Judicial Consideration of Transparency Rules**

72. In *Zillow Group, Inc. v. Midwest Real Estate Data LLC*, No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), the court similarly denied a preliminary injunction to Zillow, which had challenged restrictions on its access to MLS listing data. Significantly, the court held that "the Seventh Circuit has evaluated restrictions associated with multiple listing services under the rule of reason." 26-cv-5451, Dkt. No. 141 at 33. The court further found that where an MLS enforces its own rules and "the record [does] not show that the rules were intended solely to suppress competition," *per se* treatment is inappropriate. *Id.* at 33. The court emphasized that "*[p]er se* treatment is therefore appropriate only where the restraint is 'manifestly anticompetitive' and experience permits the Court to condemn it without a detailed examination of its anticompetitive effects." *Id.* at 31 (citation omitted). Importantly, the court also found that the relationship between an MLS and brokerages *is vertical—"a supplier to recipient of inputs"—not horizontal.* *Id.* at 32. The court further held that "the existence of these plausible alternative explanations . . . prevents the Court . . . from characterizing the alleged agreement as a 'naked restraint of trade with no purpose except stifling of competition.'" *Id.* at 33 (citation omitted).

73. Recently, federal courts considering antitrust claims involving Cooperation Rules-related policies have denied preliminary injunctions to plaintiffs challenging those policies, further supporting the Cooperation Rules' procompetitive character. In *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), the court denied Compass's motion for a preliminary injunction challenging Zillow's Listing Access Standards, which excluded from Zillow's platform listings that had been privately marketed. The court found that NAR had implemented its Clear Cooperation Policy "due to concerns about the proliferation of 'pocket listings' and certain marketing techniques that could result in 'less complete and consequently

less useful property data' and 'increasingly fractionalized and less efficient residential real estate markets.'" 25-cv-5201, Dkt. No. 184 at 9 (citation omitted). The court further noted that NAR implemented the Clear Cooperation Policy "to bolster MLSs' ability to 'create[] an efficient marketplace.'"

74. These recent holdings strongly support the conclusion that not only are the Cooperation Rules not a *per se* unlawful group boycott, but are critical to the procompetitive impact that MLSs have on the residential real estate marketplace.

## **CAUSES OF ACTION**

## **FIRST CAUSE OF ACTION**

### **DECLARATORY JUDGMENT THAT THE COOPERATION RULES DO NOT VIOLATE SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**

75. CRMLS incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

76. An actual, justiciable controversy exists between CRMLS and Compass regarding whether the Cooperation Rules violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Compass has expressly threatened to bring federal antitrust claims against CRMLS on this basis. Moreover, CRMLS has to decide right now whether to continue to enforce its Cooperation Rules, and worse, as an MLS affiliated with NAR, if it elects to stop enforcing the Cooperation Rules, it faces potential penalties from NAR, including loss of its charter.

77. The Cooperation Rules do not violate Section 1 of the Sherman Act under the rule of reason. The rule of reason, not *per se* condemnation, is the appropriate framework for evaluating the Cooperation Rules because the Cooperation Rules are rules governing the internal operations of a legitimate cooperative venture—the MLS. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 3 (2006) (internal pricing decisions of legitimate joint venture not *per se* unlawful); *see also*

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 (1984) (rule of reason applies where restraint is essential to the product's availability). Indeed, the Seventh Circuit "has evaluated restrictions associated with multiple listing services under the rule of reason." *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, Case No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), Dkt. No. 141 at 33.

78. Critically, the Cooperation Rules do not produce any anticompetitive effects. The rules do not raise prices, reduce output, exclude competitors from the market, or diminish innovation. To the contrary, the Cooperation Rules increase the output of the MLS by ensuring that publicly marketed listings are shared with all participants, thereby expanding the pool of available properties for buyers and the pool of potential buyers for sellers. The rules do not restrict any broker's ability to compete; they simply require that brokers who wish to benefit from the cooperative's data also contribute to it. Sellers retain complete freedom to choose whether to publicly market their properties, to use "No Cooperation Listings," or to enter into non-exclusive agreements that do not require MLS submission. And brokers of all sizes—from sole proprietors to the largest national firms—compete on a level playing field because they all have access to the same comprehensive listing data. In short, the Cooperation Rules promote competition rather than restrain it.

79. Under the rule of reason, the Cooperation Rules are lawful because they have substantial procompetitive justifications that outweigh any anticompetitive effects. The Cooperation Rules enhance market transparency, increase the output of the MLS, preserve the cooperative product, prevent free-riding, and ensure that consumers on both sides of the marketplace—home buyers and home sellers—benefit from comprehensive and accurate listing information. Courts have recognized that MLS rules serve the legitimate purpose of maintaining

"fresh, comprehensive, and accurate listings," and that alternatives to the Cooperation Rules risk "fragment[ing] the real estate market" and "limit[ing] transparency." *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JDA-SDA (S.D.N.Y.), Dkt. No. 184 at 13-14.

80. The Cooperation Rules do not constitute a group boycott. A group boycott requires an agreement to exclude competitors from the market. The Cooperation Rules do not exclude anyone from the market; they require only that participants who publicly market listings also share those listings on the MLS. Participants remain free to operate as No Cooperation Listings, or to use non-exclusive commission agreements, or to choose not to publicly market listings at all. The Cooperation Rules impose no restriction on any participant's ability to compete in the real estate brokerage market. Moreover, "antitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement." *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), Dkt. No. 141 at 32 (citation omitted). As that court recognized, the relationship between an MLS and its participating brokerages is vertical—"a supplier to recipient of inputs"—not horizontal. *Id.*

81. No less restrictive alternative to the Cooperation Rules exists that would achieve its procompetitive objectives. The non-exclusive commission agreement not requiring submission for cooperation because access to the property and seller remain unrestrained by an exclusive commission agreement already provides a balanced accommodation that allows sellers the option to never place their for-sale property into the MLS while still conducting any marketing or advertising activity they desire. The CRMLS Coming Soon status provides a delay to broad MLS exposure while still ensuring that publicly marketed listings are ultimately shared. Eliminating the Cooperation Rules altogether would reintroduce the free-rider problem and degrade the quality and comprehensiveness of the MLS's cooperative data pool.

82. CRMLS is concerned that submitting to the Compass demands to hide for-sale properties from the MLS and the marketplace, while the seller is prevented from interacting with any competing buyer agents because of the restraints of the exclusive commission agreement, will cause buyers, or buyer agents to bring creditable antitrust claims against CRMLS.

83. Moreover, unlike in prior situations with Compass, the threat of litigation is imminent—it has provided a fixed timeline for purported compliance (October 6, 2026) and its CEO made public statements at the CMLS Conference, on September 30, 2026, stating Compass would file suit. Moreover, the Demand Letter was copied to the DOJ and FTC, contained a litigation-hold notice, and Compass recently initiated litigation against NWMLS seeking similar relief.

84. In sum, the dispute is ripe, and CRMLS is entitled to a declaration that the Cooperation Rules do not violate Section 1 of the Sherman Act.

**<u>SECOND CAUSE OF ACTION</u>**

**DECLARATORY JUDGMENT THAT THE COOPERATION RULES DO NOT VIOLATE THE CALIFORNIA CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16720)**

85. CRMLS incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

86. An actual, justiciable controversy exists between CRMLS and Compass regarding whether the Cooperation Rules violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

87. Claims under the Cartwright Act are analyzed under the same standard as claims under the Sherman Act. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law

because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., was modeled after the Sherman Act." (citation omitted)).

88. For the same reasons set forth in the First Cause of Action, the Cooperation Rules do not violate the Cartwright Act. The Cooperation Rules are procompetitive rules that are lawful under the rule of reason, do not constitute a group boycott, and for which no less restrictive alternative exists.

89. CRMLS is entitled to a declaration that the Cooperation Rules do not violate the California Cartwright Act.

**PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

WHEREFORE, Plaintiff CRMLS respectfully requests that this Court enter judgment in its favor, and grant the following relief:

A. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the Cooperation Rules do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the Cooperation Rules do not violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.;

C. An injunction permanently enjoining Compass from bringing or pursuing any claim against CRMLS alleging that the Cooperation Rules violate the federal or state antitrust laws;

D. An award of CRMLS's reasonable attorneys' fees and costs incurred in this action; and

E. Such other and further relief as this Court deems just and reasonable, including preliminary and temporary relief, and fees and costs as may be requested or required.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Claude G. Szyfer*
Claude G. Szyfer
**HOGAN LOVELLS CADWALADER US LLP**
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 918-3100
claude.szyfer@hlc.com

Liam E. Phibbs (*pro hac vice forthcoming*)
Holden A. Steinhauer (*pro hac vice forthcoming*)
**HOGAN LOVELLS CADWALADER US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
liam.phibbs@hlc.com
holden.steinhauer@hlc.com

*Attorneys for Plaintiff California Regional Multiple Listing Service, Inc.*