# EXHIBIT A

EimerStahl LLP

224 South Michigan Avenue
Suite 1100
Chicago, Illinois 60604
Tel 312 660 7600 Fax 312 692 1718

Nathan P. Eimer
(312) 660-7601
neimer@eimerstahl.com

September 8, 2026

**VIA E-MAIL**

Art Carter, Chief Executive Officer
California Regional Multiple Listing Service
artc@crmls.org

**Re: Formal Legal Demand to Stop Fining/Punishing Agents for Public Marketing**

Dear Mr. Carter:

We represent Compass, Inc. in potential antitrust litigation against California Regional Multiple Listing Service.

Following on the August 27 email from Ethan Glass, to which you did not respond, this letter is formal notice that CRMLS is violating the U.S. antitrust laws by fining real estate professionals “1% of list price, no less than $500 and not to exceed $2,500” for publicly marketing an office exclusive listing and by threatening further punishment, such as suspension or expulsion from the MLS.[1]

To avoid being named as a defendant in a federal antitrust lawsuit, CRMLS must provide written confirmation to me by 5:00 PM ET on October 6, 2026, that **CRMLS will not fine or punish a real estate professional for *publicly* marketing office exclusive listings.** If you confirm, Compass will waive and release CRMLS from the Compass claims described in this letter.

An antitrust case against CRMLS would be straightforward and compelling. MLSs are inherently vulnerable to antitrust claims because they are combinations of direct competitors dictating how other competitors are allowed to compete. It is thus not surprising that MLSs and NAR have lost virtually every antitrust suit and government investigation challenging their mandatory rules over the last 60 years.

Our antitrust claim against CRMLS is even stronger than those prior cases. CRMLS has a rule requiring real estate professionals to submit listings to the MLS and consequently market their clients’ homes only as allowed by CRMLS. Since 1971, as recognized by the FTC in its landmark study, for an MLS with a mandatory submission rule to comply with the antitrust laws, it must give real estate professionals and homeowners true alternatives to the MLS limitations and restrictions on selling a home—alternatives that existed for over 50 years, that the industry called “office exclusive” listings by the industry.[2] That means consumers are entitled to a choice: market a home using the MLS (e.g., its distribution services) under the MLS’s limitations and restrictions; or market a home, as an office exclusive, without MLS distribution and without the its limitations and restrictions. Despite attempts last year to change the definition of “office exclusive,” for over 50 years, this is exactly how those listings worked—they were not subject to the MLS limitations and restrictions, and were publicly marketed however the real estate professional and homeowner legally wanted. As the FTC wrote, this choice is critical to antitrust compliance because, “[w]here ‘office exclusives’ are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit.”[3] On the other hand, without the freedom to use office exclusives, CRMLS’s mandatory submission rule violates the antitrust laws, as detailed below.

Moreover, at a time when government regulators and public interest organizations have been advocating for listings to be marketed more publicly, CRMLS's fines and punishments for public marketing make listings *less available*. CRMLS punishes a real estate professional for any public marketing of an office exclusive, including on public facing websites available to everyone. This hurts competition and consumers. We are sure that there is not a single real estate professional who wants to be fined by an MLS for following their client's lawful marketing instructions, which is their fiduciary and statutory duty to their clients. We are sure that real estate professionals want to compete for clients with creative marketing strategies. Homeowners lose the benefits of the loyalty of their real estate professional, the competition between real estate professionals, and the choice of how to publicly market their own homes. And, of course, buyers would benefit if all office exclusive listings were allowed by CRMLS to be publicly marketed.

CRMLS has a simple choice: (a) stop fining and punishing real estate professionals for publicly marketing office exclusives; or (b) defend, in a federal antitrust case, the choice to block competition, force office exclusives to be less accessible to buyers, undertake discovery burdens, pay your costs of litigation, pay us triple our damages, and reimburse us all of our attorneys' fees and costs.[4]

**A. <u>Restrictive MLS rules have created antitrust liability for over 75 years.</u>**

MLS rules have been the target of federal antitrust enforcement for decades. The legal battles began in the 1940s when the DOJ brought civil *and criminal* charges for rules that enforced a 6% commission rate.[5] More recently, a federal appeals court held that a challenge to an MLS policy limiting public marketing conduct, as characterized by the plaintiff, "shares all the hallmarks of a group boycott" that stated a valid antitrust claim.[6] The DOJ noted that the same policy "restricts the choices available to home sellers and listing brokers who want to market homes outside the NAR-affiliated MLS systems . . . ."[7] In a case brought by the FTC against a Michigan MLS, a federal court of appeals held that the MLS's website policy—which limited the public distribution and display of limited-service property listings based on the nature of the listing contract—"unreasonably restrained competition."[8] And, in a case led by Compass Chief Legal Officer, Ethan Glass, when he was at the DOJ, a federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[9]

Most recently, Compass sued the Northwest Multiple Listing Service. There, the Court rejected every legal argument CRMLS might make, and more: Compass did not state a plausible Section 1 claim; the rules were necessary to stop free-riding; MLSs cannot be sued because of the "two-sided-market" and "refusal-to-deal" doctrines; and NWMLS was simply enforcing rules that Compass agreed to.[10] Within 5 months of the Court's decision, NWMLS agreed to change its rules.[11]

In short, over 60 years, MLSs have spent time and money in court defending their unreasonably restrictive practices, with the same result in almost every case: those practices end.

**B. <u>CRMLS is repeating the same illegal acts from before the "Fourteen Points."</u>**

As the FTC described in its seminal report,

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points. The NAR's November 15, 1971 statement,

EimerStahl LLP

setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points."[12]

Specifically, the Fourteen Points antitrust policy addressed the fact that, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[13] To address this antitrust violation, Points 10 and 11 of the "Fourteen Points" antitrust policy provide:

> ***10. MLS shall not: Make any rule regulating the advertising or promotion of any listing.***
>
> ***11. MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] "office exclusive."***[14]

The FTC found that the Fourteen Points antitrust policy in general, and Point 11 in particular, "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[15]

The recent attempt to change the definition of an office exclusive only increases the exposure for MLSs. From 1971 to 2025, mandatory submission rules complied with the antitrust laws because real estate professionals and homeowners had a true alternative: they could use office exclusives *without any limit to public marketing*. MLS rules simply provided "[i]f the seller refuses to permit the listing to be disseminated by the service, the participant may then take the listing (office exclusive) and such listing shall be filed with the service but not disseminated to the participants."[16] The DOJ and a federal judge similarly defined "Office Exclusive" to be "a listing in which the owner refuses to grant permission for distribution of the listing to the MLS."[17] None of these definitions of office exclusive limited public marketing. In fact, Bright MLS, one of the largest MLSs in the country, defines "Office Exclusive/Limited Marketing" as "Properties *being marketed* on a limited basis outside the MLS and not shared within the MLS for cooperation with all subscribers."[18] However, in August 2025, right after Compass started publicly marketing office exclusives, NAR started using a definition of office exclusives that conflicts with 50 years of history: a listing "where the seller has directed that their property not be disseminated through the MLS *and not be publicly marketed*."[19] Such attempts to block public marketing by wordplay subjects CRMLS to the antitrust risk that it has avoided for decades.

Simply stated, fining and punishing real estate professionals for publicly marketing office exclusives has returned CRMLS to the days before the Fourteen Points. In doing that, CRMLS is violating the antitrust laws.

### C. Compass has a strong antitrust claim against CRMLS.

In addition to this compelling history, straightforward antitrust analysis shows that fining or punishing real estate professionals for publicly marketing office exclusives violates the antitrust laws and is illegal.

***First***, CRMLS's prohibition on public marketing of office exclusives is a horizontal agreement among competitors—a joint restraint adopted and enforced by competing brokers acting through the MLS. By definition, an MLS is a combination of competitors that dictates how other competitors are allowed to compete. (Some MLSs also conspire with other MLSs through the Council of Multiple Listing Services.) The public marketing prohibition unreasonably restrains trade by eliminating an entire method of competition that homeowners demand and that brokers would otherwise provide: the public marketing of office exclusives. CRMLS forces homeowners to forfeit their preferred marketing strategy or their

preferred listing type; and CRMLS blocks real estate professionals from competing on marketing strategies.

***Second***, real estate professionals cannot leave CRMLS to avoid fines and punishments. As is common knowledge, and as courts have almost universally found under the antitrust laws, MLS membership is not voluntary. Membership in CRMLS is not a choice, it is a requirement of trade.

***Third***, CRMLS is not just controlling what real estate professionals do on the MLS platform, but is explicitly and intentionally controlling how real estate professionals and homeowners (who are not even members) act off of your platform. As an example, CRMLS fines real estate professionals for marketing an office exclusive on public websites.

***Fourth***, CRMLS might seek to blame NAR and say that CRMLS is just following mandatory NAR policy, but CRMLS is responsible for the fines and punishments you impose against real estate professionals. In fact, NAR has expressly stated that, even for mandatory MLS policy, "[e]nforcement is the responsibility of the local MLS."[20]

* * *

Today, many successful MLSs allow public marketing of office exclusives, including Bay Area Real Estate Information Services, Bright MLS, Garden State MLS, MetroList Services, Inc., MLS Property Information Network, Miami Realtors MLS, RealTracs, and West Penn Multi-List. These MLSs collectively cover 12 states plus Washington, D.C., representing about 350,000 real estate professionals (about 25% of the U.S.). After all, the purpose of the MLS is not to tell real estate professionals and homeowners how to market properties; instead, it is "the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public."[21]

Let there be no confusion about our objectives: Compass is advocating for more public marketing of listings, expanded consumer choice, and increased market competition, and we will spend millions of dollars to sue CRMLS and other MLSs to accomplish those goals.

In light of imminent litigation, CRMLS, its officers, directors, committee members, and employees are hereby placed on notice to suspend all automatic deletion policies and to preserve all documents and electronic data relating to (1) office exclusives, (2) marketing of listings on and off-MLS, (3) competition between MLSs and real estate professionals, and (4) your business strategies.

Sincerely,

Nathan P. Eimer

cc: Nicole Sarrine, Deputy Assistant Attorney General for Civil Conduct
(Nicole.Sarrine@usdoj.gov)
U.S. Department of Justice, Antitrust Division

Daniel Guarnera, Director (Daniel.Guarnera@ftc.gov)
U.S. Federal Trade Commission, Bureau of Competition

---

[1] CRMLS, *MLS Citation Policy*, at 3 (July 10, 2026).

[2] FTC, *The Residential Real Estate Brokerage Industry*, at 129 (Dec. 1983); *see also* Final Judgment, *United States v. Multiple Listing Serv. of Hilton Head Island, Inc.*, Case No. 9:07-cv-03435-SB (D.S.C. May 28, 2008), ECF No. 16, at 5 (defining "Office Exclusive" as "a listing in which the owner refuses to grant permission for distribution of the listing to the MLS.").

[3] FTC, *The Residential Real Estate Brokerage Industry*, at 129 (Dec. 1983).

[4] 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").

[5] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

[6] *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022).

[7] Final Br. Of Appellants United States of America, et al., *Nat'l Assn of Realtors v. United States*, No. 23-5065 (D.C. Cir. Aug. 18, 2023), ECF No. 2013267, at 10.

[8] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[9] Final Judgment, *United States v. Consolidated Multiple Listing Serv., Inc.*, Case No. 3:08-cv-01786-SB (D.S.C. Aug. 27, 2009), ECF No. 68, at 4.

[10] *Compass, Inc. v. Nw. Multiple Listing Serv.*, No. 2:25-cv-00766-JNW, 2026 WL 776138 (W.D. Wash. Mar. 19, 2026).

[11] https://www.compass.com/newsroom/press-releases/a7Jxi0oJq1JansK7dBFWO (Aug. 31, 2026).

[12] FTC, *The Residential Real Estate Brokerage Industry*, at 109 (Dec. 1983).

[13] *Id*. at 130.

[14] *Id*. at 134 n.354.

[15] *Id*. at 130.

[16] Nat'l Ass'n of Realtors, *Handbook on Multiple Listing Service Policy*, § 1.3 (2024).

[17] Final Judgment, *United States v. Multiple Listing Serv. of Hilton Head Island, Inc.*, Case No. 9:07-cv-03435 (D.S.C. May 28, 2008), ECF No. 16, at 5.

[18] Bright MLS, *Rules Governing Use of Bright's Services*, at 6 (July 22, 2026) (emphasis added).

[19] Compare FTC, *The Residential Real Estate Brokerage Industry*, at 129 (Dec. 1983), *with* Nat'l Ass'n of Realtors, *Handbook on Multiple Listing Policy*, Policy Statement 8.14 (2025) (emphasis added).

[20] https://www.nar.realtor/about-nar/policies/mls-policy/office-exclusive-listings/pre-marketing-guidance.

[21] Nat'l Ass'n of Realtors, *Handbook on Multiple Listing Policy*, Antitrust Compliance Policy (2026).