**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC., and ONEKEY® MLS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>COMPASS, INC.,<br><br>Defendant. | Civil Action No.: 1:26-cv-08796-MKV<br><br>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>**28 U.S.C. §§ 2201–2202** |

Plaintiffs California Regional Multiple Listing Service, Inc. ("CRMLS") and OneKey® MLS LLC ("OneKey," and together with CRMLS, either "Plaintiffs" or the "MLSs") respectfully state the following claims for declaratory and injunctive relief against Defendant Compass, Inc. ("Compass") in this First Amended Complaint.

## PRELIMINARY STATEMENT

This case concerns the efforts of Compass—the largest real estate brokerage in the United States—to bully the real estate industry into abandoning rules designed to promote transparency, broad consumer access, and robust competition among brokerages. At issue are rules that serve a straightforward purpose: if a seller authorizes their agent to seek buyers from outside the agent's brokerage, all brokerages participating in the multiple listing service ("MLS") cooperative—not just one—should have the opportunity to connect their buyer clients with that property. Compass, however, seeks to dismantle these rules so that it can pursue its stated corporate strategy of controlling for-sale property inventory as a competitive weapon—publicly marketing properties to attract buyers while withholding those same properties from the MLS cooperative whose data Compass uses to service its own clients. In short, Compass wants to free-ride on the comprehensive listing contributions of thousands of cooperating brokerages while hoarding its own inventory for its exclusive financial benefit. Having already sued others in pursuit of this agenda, and having sent demand letters threatening additional litigation, Compass threatened to sue CRMLS unless it capitulated to Compass's demands by October 6, 2026, and sent an identical demand letter threatening the same litigation against OneKey, New York State's largest MLS. CRMLS and OneKey bring this declaratory judgment action to establish that their respective Cooperation Rules are lawful under federal and state antitrust law because they cause no anticompetitive harm, and are in fact widely recognized as procompetitive.

## NATURE OF THE ACTION

1. This civil action seeks declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Plaintiffs bring this action to obtain a judicial declaration that their respective, substantively similar Cooperation Rules (defined below) governing the submission, access, use, and distribution of CRMLS and OneKey's listing records are lawful under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq., and the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq.

2. The Cooperation Rules ensure that MLS listings, which contain contributions from subscribers, provide transparency and access for subscribers and their consumers, promote cooperation amongst participating brokerage firms in each MLS, and create reasonable parameters to prevent free-riding by recalcitrant brokers and/or agents. Plaintiffs' rules provide for more vibrant competition amongst all participating brokerage firms and importantly provide for an efficient and transparent real estate marketplace that benefits all consumers, whether they are a seller or a buyer.

3. CRMLS is one of the largest MLSs in the United States, with approximately 94,000 real estate professional subscribers and an additional 50,000 agents and appraisers who participate in competing MLSs across California, who have direct access to CRMLS listing records via data share agreements between CRMLS and those competing MLSs.

4. OneKey is New York State's largest MLS, serving real estate professionals and consumers across the Hudson Valley, Long Island, and the New York City boroughs of Manhattan, Brooklyn, Queens, and the Bronx, with more than four million active, pending, and historical listings and approximately 40,200 real estate professional subscribers.

5. CRMLS and OneKey operate broker cooperatives that provide real property information-sharing platforms and distribution systems that enable real estate brokers and agents to input and search for properties that are for sale, and to research those listing records to provide opinions (such as on the value of a home), make recommendations for their clients, and provide various consulting services to their clients. Using the MLSs' listing records, subscribers can recommend information about the home selling process, including decisions on listing price which then helps to connect home sellers with the broadest possible pool of informed and knowledgeable prospective buyers. The MLSs' broker cooperative ensures that agents and the consumers they represent have access to up-to-date, comprehensive, and transparent housing market data.

6. This action arises from two formal demand letters, each dated September 8, 2026, sent by outside counsel for Compass. One was sent to Art Carter, CRMLS's Chief Executive Officer (the "Demand Letter"). *See* Exhibit A (Demand Letter). In the Demand Letter, Compass threatened to bring a federal antitrust lawsuit against CRMLS, and unnamed other MLSs, unless CRMLS confirmed, by October 6, 2026, that it would cease enforcing its Rule 7.9. That rule governs the submission of for-sale properties to the CRMLS cooperative when the listing broker has an exclusive right to sell or seller reserved listing agreement with the seller preventing any *buyer agent* from accessing or communicating with that seller. Pursuant to Rule 7.9, submission of the for-sale property for cooperation to CRMLS is triggered upon the public marketing of the property. CRMLS also provides an additional seller option, Rule 7.9.1, called the "No Cooperation Listing," under which a seller may instruct the listing broker in writing that the property not be marketed or advertised to the public and not be disseminated in the MLS. While some mistakenly refer to such a listing as an "office exclusive" listing, this phrase is confusing

and inaccurate since virtually all listings are subject to exclusive commission agreements, and the entire dispute here concerns marketing a for-sale property *outside of the exclusive broker's real estate office*. CRMLS Rules 7.9 and 7.9.1 are attached as Exhibit B and shall be referenced collectively as the "CRMLS Cooperation Rules."

7. Likewise, Compass's outside counsel sent OneKey a nearly identical demand letter, also dated September 8, 2026 (the "OneKey Demand Letter," and together with the Demand Letter sent to CRMLS, the "Demand Letters"), addressed to Richard Haggerty, OneKey's Chief Executive Officer. *See* Exhibit F (OneKey Demand Letter). The OneKey Demand Letter also threatened a federal antitrust lawsuit against OneKey unless it confirmed, by 5:00 PM ET on October 6, 2026, that it "will not fine or punish a real estate professional for publicly marketing office exclusive listings"—that is, that it would cease enforcing OneKey Rule 302.2 as to such listings. Under Rule 302.2, "[w]ithin one (1) business day after a property is publicly marketed, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants." OneKey Rule 316 separately permits a Participant to accept an "Office Exclusive Listing"—an exclusive listing "that is not made available to other MLS customers in the MLS database per the informed consent and instructions of the seller"—without disseminating that listing through the MLS. OneKey Rules 302.2, 303.2, and 316, together with the related definitions in Rule 102, are attached as Exhibit G and shall be referenced collectively as the "OneKey Cooperation Rules." The CRMLS Cooperation Rules and the OneKey Cooperation Rules are referenced collectively as the "Cooperation Rules."

8. In short, the Cooperation Rules are straightforward: they require that when a broker publicly markets a property for sale—through yard signs, websites, social media, flyers, or similar means—and the property is subject to an exclusive listing agreement (preventing any

competing buyer agent from accessing the seller directly), that property must also be submitted to the MLS for cooperation with other participating brokers. At the same time, the rules preserve the option for sellers and their brokers to market properties exclusively within a single brokerage—as “No Cooperation Listings” under the CRMLS Cooperation Rules or “Office Exclusive Listings” under the OneKey Cooperation Rules—without any obligation to submit the property to the MLS for cooperation. The rules thus give sellers and brokers multiple clear choices: keep a for-sale property within one brokerage if that firm exclusively controls access to the seller, or market it publicly to the broader world, including to the entire MLS broker cooperative. What the rules do not permit is having it both ways—selectively publicly marketing a property to attract buyers while simultaneously withholding that property from the MLS cooperative and the thousands of other brokers and their buyer clients who participate in it and who do actually share their listings with the MLS cooperative.

9. The practical effect of what Compass seeks is to have its “cake and eat it too.” Compass wants to access and use the comprehensive listing data that CRMLS and OneKey each compile from the contributions of thousands of cooperating brokers—data Compass uses to develop comparative market analyses, advise clients, and compete for business (including recruiting agents)—while simultaneously withholding its own publicly marketed properties from those same cooperative pools. In other words, Compass wants to free-ride on the listing contributions of every other participating brokerage while hoarding its own inventory to gain an unfair competitive advantage because it alone controls access to the seller. If Compass prevails, the result would be a two-tiered and fractured marketplace: smaller brokerages that play by the rules and share their listings, and giant brokerages like Compass that take from the cooperative without giving back.

10. At the heart of this dispute is the very essence of an MLS cooperative where real estate brokers share information about properties for sale so that any broker, regardless of size, can match any buyer with any available property. The MLS exists because brokers agreed to pool their listing information: each broker contributes its listings in exchange for access to everyone else's. This "give-to-get" arrangement is what makes the MLS work. Without it, brokers and buyers would be left with what economists call a "hoot-and-holler" system-calling around to individual brokerages one by one to find out what properties might be available-which would dramatically increase the time, effort, and cost of every real estate transaction and ultimately make brokerage services and houses less affordable for consumers. The rules at issue here simply memorialize this foundational bargain: if a broker publicly markets a property to attract buyers, that broker must also share the listing with the MLS so all participating brokers and their clients can see it.

11. Compass's Demand Letters were copied to the Antitrust Division of the U.S. Department of Justice and the Bureau of Competition of the Federal Trade Commission.

12. The CEO of Compass, Robert Reffkin, backed up those threats of litigation during the recent Council of Multiple Listing Services conference in Fort Lauderdale, Florida. On September 30, 2026, during an interview in front of a packed room of over 900 attendees, Mr. Reffkin stated unequivocally that Compass would begin filing lawsuits against MLSs across the country in mid-October if they failed to commit by October 6, 2026, to stop fining Compass agents for publicly marketing listings withheld from MLS cooperation (which he referred to as "office exclusives")—the very commitment the Demand Letters demanded of CRMLS and OneKey.

13. Compass's threatened claims are meritless. The CRMLS Cooperation Rules have been in effect since May 2020, and the OneKey Cooperation Rules, which likewise implement

the NAR Clear Cooperation Policy adopted in November 2019, have been in effect since OneKey began operating in 2020. Both sets of rules are procompetitive and serve the fundamental purpose for which MLSs were created: ensuring that publicly marketed residential real estate listings are broadly shared and accessible to both participating agents and their customers, consistent with sellers' marketing choices, and that home buyers and the agents they choose have access to the most comprehensive inventory of available properties. In short, the Cooperation Rules ensure transparency, access, and competition in the real estate marketplace, and prevent free-riding by brokers and agents that use the CRMLS and OneKey listing records to obtain new clients or service existing clients.

14. The CRMLS Cooperation Rules require that: "Within one (1) business day of marketing or advertising a residential property to any member of the public for sale which contains one to four units, or is a residential vacant land lot which is subject to any exclusive right to sell or seller reserved listing agreement, the Listing Broker must submit the property into the MLS for cooperation with other CRMLS participants." *See* Exhibit B, Rule 7.9. The OneKey Cooperation Rules similarly require that "[w]ithin one (1) business day after a property is publicly marketed, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants." *See* Exhibit G, Rule 302.2(a).

15. CRMLS Rule 7.9, however, preserves sellers' ability to publicly market, share, and communicate the existence of for-sale properties without submitting their property to CRMLS, while protecting the seller from the negative impacts of an exclusive commission agreement which would limit that seller's opportunity or choices to interact with a different agent that may represent an interested buyer. The CRMLS Cooperation Rules also provide the additional seller choice of allowing an exclusively retained broker to communicate and share the

property with that firm's customers and clients as a "No Cooperation Listing" without any obligation to list those properties on the MLS. *See* Exhibit B, Rule 7.9.1. The OneKey Cooperation Rules likewise permit a seller, after being informed of the benefits of the MLS, to direct that a property be taken as an "Office Exclusive Listing" that is not broadly disseminated to other MLS participants. *See* Exhibit G, Rules 102.8, 316.1. Both sets of rules require that once a seller's broker publicly markets a property subject to an exclusive listing agreement—through flyers, yard signs, digital marketing on public-facing websites, email blasts to consumers, multi-brokerage listing sharing networks, or similar means—the for-sale property information must also be submitted to the MLS for cooperation so that all cooperating buyer agents and their buyer consumers and clients have full and fair access to the for-sale information, and an opportunity to see and buy the home. The purpose and premise of the Cooperation Rules is simple and direct: If access to the seller is restrained by an exclusive commission agreement, and the seller has authorized their own agent to conduct public marketing of their property, then all other brokerage firms (and their agents) participating in the MLS cooperative should have the opportunity to represent a buyer in pursuing a purchase of that for-sale property.

16. CRMLS responded to the Compass Demand Letter citing its concern that capitulating to Compass's demands could result in potential antitrust claims being asserted by buyers and their brokers against CRMLS. In late 2024, Compass made similar demands, to which CRMLS refused to capitulate, again citing antitrust concerns from buyers and buyers' brokers. CRMLS's responses to both of Compass's demands are attached as Exhibits C and E.

17. After receiving a short extension of time, OneKey likewise responded to the OneKey Demand Letter on October 20, 2026, rejecting its factual assertions and legal conclusions and declining to make the requested changes. OneKey explained that its rules preserve seller

choice while preventing free-riding and protecting interbroker competition, transparency, and consumer access. *See* Exhibit H. Compass's recent public statements, as well as other lawsuits Compass has filed, demonstrate the threats against both CRMLS and OneKey are not hollow, and the dispute between the parties is ripe for judicial determination.

18. Plaintiffs seek a declaration from this Court that their respective Cooperation Rules, and their requirement that a publicly marketed for-sale property be submitted to the MLS for cooperation with the other participants of that MLS, are not unlawful under federal antitrust law and, as to CRMLS, California antitrust law, and, as to OneKey, New York antitrust law, and an injunction preventing Compass from pursuing the threatened antitrust claims.

## **<u>THE PARTIES</u>**

19. Plaintiff CRMLS is a California mutual benefit corporation with its principal place of business in Chino Hills, California. CRMLS is one of the largest MLSs in the United States, serving over 94,000 real estate professionals, including brokers and agents, across sixteen California counties. CRMLS operates a broker cooperative that provides a real property information-sharing platform and distribution system that enables real estate brokers and agents to input and search for properties that are for sale, and to research CRMLS listing and sale records so as to provide opinions and consulting services to their clients. Subscribers use the CRMLS listing records to share real estate listing information, develop opinions and make recommendations for their clients.

20. Plaintiff OneKey is a standalone New York limited liability company owned by two Realtor® association shareholders, with its principal place of business in Farmingdale, New York. OneKey is New York State's largest MLS, serving real estate professionals and consumers in its service area, which consists of Bronx, Dutchess, Kings, Nassau, New York, Orange, Putnam,

Queens, Rockland, Suffolk, Sullivan, and Westchester Counties. OneKey's participating brokerages share their listing data and "invite other Participants to enter into cooperative relationships with them for the sale of their listings," and OneKey's rules are designed to "ensure the integrity of [its] listing data, and provide a level playing field for [its] Participants and the consumers with whom they do business." OneKey Rules 200, 201.

21. Defendant Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is a publicly traded company and, following many mergers, the largest real estate brokerage in the United States. Compass employs thousands of real estate agents nationwide, including in California and New York, and is a participant in both CRMLS and OneKey.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because Compass's threatened action presents a substantial question of federal antitrust law under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

23. An actual, justiciable controversy exists between each Plaintiff and Compass. Compass's September 8, 2026 Demand Letters explicitly threatened federal antitrust litigation against CRMLS and OneKey unless each capitulated to Compass's demands by October 6, 2026[1]. The Demand Letters set forth specific legal theories under which Compass claimed the Cooperation Rules violate the Sherman Act. On September 30, 2026, CRMLS responded citing its concerns that agreeing to the rule changes in the Compass Demand Letters would potentially cause CRMLS to be in violation of various antitrust laws. On October 20, 2026, OneKey likewise

[1] Again, OneKey received a short extension of time for response—to October 20, 2026.

rejected Compass's demands, explaining that its rules preserve seller choice while preventing free-riding and protecting competition and consumer access. The dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

24. This Court has personal jurisdiction over Compass because it is incorporated in Delaware and has its principal place of business in New York, New York. Compass is therefore subject to general personal jurisdiction in this District. In addition, Compass conducts substantial business in New York, employs agents who operate in this District, participates in OneKey, and directed its Demand Letters to CRMLS and OneKey with the knowledge that the threatened litigation would affect interstate commerce, including commerce in this District.

25. Venue is proper in this District under 28 U.S.C. § 1391(b) and under section 12 of the Clayton Act, 15 U.S.C. § 22, because Compass resides and directs its corporate strategy in this District, a substantial part of the events giving rise to the claims occurred in this District, Compass may be found in this District and transacts business in this District. In addition, the OneKey Cooperation Rules govern listings in counties within this District, including New York, Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan Counties.

## FACTUAL BACKGROUND

### A. CRMLS, OneKey, and the MLS System

26. An MLS is a network of real estate professionals (including agents, appraisers, and other subscribers) that agree to cooperate with each other by following the reasonable rules of the cooperative to timely and comprehensively share all the details and access to properties that are for sale or rent, including closing transaction information, resulting in an efficient, fair and

equitable marketplace to benefit their clients. The MLS system has been a cornerstone of the American residential real estate market for more than a century, enabling the efficient matching of home sellers with home buyers.

27. The MLS serves an essential market-making function. As the Federal Trade Commission recognized in its 1983 study of the residential real estate brokerage industry (the "Butters Report"), "both sellers and buyers would be served best if they could reach *all potential buyers* or receive information relating to all homes for sale, through a single, convenient source." (emphasis added). The Butters Report found that the MLS "creates [an] excellent centralized source of information regarding housing values" and that the "market-making effect of the MLSs probably exceeded even the founders' expectations." *See* FTC, The Residential Real Estate Brokerage Industry (1983), at 11, 113.

28. Even before the incredible advances in technology and the internet, the 1983 Butters Report further found that the MLS doubles the probability of a property selling and is "essential to most brokers in order to market their properties efficiently." *Id.* at 128. These findings confirm that the MLS is a procompetitive institution that benefits consumers on both sides of the real estate transaction—both home sellers and home buyers.

29. In 2007, in the FTC and DOJ's joint report, entitled "Competition in the Real Estate Brokerage Industry" (the "2007 Competition Report"), the agencies both recognized that "[m]ost MLSs *require* that a member broker, upon acceptance of a listing, *enter the listing into the MLS database within a short period of time, e.g., twenty-four to seventy-two hours*." 2007 Competition Report at 11 (emphasis added). At no point in the 2007 Competition Report did the agencies state that such a mandatory submission rule was anti-competitive or unfair to participating brokerage firms.

30. To the contrary, later in the 2007 Competition Report, the agencies acknowledged the importance of the MLS to not just sellers and their exclusive agents, but also to buyers and other brokers. Specifically, the agencies stated that buyers benefit from the MLS because they can have access to "a single source (that is, a single broker) for information regarding the vast majority of homes for sale within a given area, instead of visiting multiple brokerages to obtain such information. Access to the largest number of potentially appropriate homes for sale allows buyers to maximize their chances of finding a home that most clearly matches their shared characteristics." *Id.* at 12 (citation omitted).

31. As the agencies readily acknowledged in the 2007 Competition Report, "[t]he efficiencies associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature." *Id.* at 13 (citation omitted).

**1. CRMLS**

32. CRMLS values the vital market-making and efficiency enhancing role it plays in the real estate marketplace, and seeks to ensure that its rules balance the benefits for all sellers, buyers, exclusive listing brokers, and cooperating brokers representing buyers. As noted above, in addition to serving 94,000 real estate professionals across California that have subscribed, CRMLS also provides access to its full data set to a number of competing MLSs so that their additional 50,000 agents benefit from access to the CRMLS listing records. Indeed, CRMLS's database contains tens of thousands of active listings and has over six million individual MLS listing records, which constitute the most comprehensive source of residential real estate market data in its service area. CRMLS enables its participants to provide their clients—home sellers and home buyers alike—with access to the most complete and accurate information about properties available for sale, and past transaction data. CRMLS also provides access to licensed

real estate appraisers to use the timely and comprehensive MLS listing records to prepare property appraisals for both consumers and lenders—further facilitating the completion of real estate transactions. Furthermore, CRMLS licenses the CRMLS listing records for use by its participants in the operations of the brokerage's back-end office systems, for which Compass holds such a license. The CRMLS listing records are also licensed to entities that support real estate transactions and need access to timely and accurate real estate transaction records such as lending institutions, Fannie Mae, Freddie Mac, FHA, VA, appraisal review companies, and insurance companies. The support provided by these entities is critical to the speedy due diligence and closing of sales that support those cooperating brokers that use CRMLS.

33. CRMLS operates as a cooperative venture. Its participants—competing brokerages and agents—contribute information and media about for-sale property, which is combined with real property information and the intellectual property of CRMLS to create an MLS listing record. All participating brokerages contribute their for-sale property information to the shared platform in exchange for the reciprocal benefit of access and use of those MLS listing records contributed by other cooperating participants. The value of CRMLS depends on the timeliness, breadth and completeness of its data; the greater the timeliness and accuracy of the MLS listing records shared on the platform, the more useful the platform is to every participant and every consumer those participants serve.

34. That said, CRMLS faces extensive and vigorous competition from other regional MLSs that also operate in overlapping service areas. Indeed, to the south, San Diego MLS operates a successful and competitive MLS, and in the Los Angeles and Westside areas, for decades, CLAW has also operated a competing MLS. CRMLS welcomes this competition, and even supports both SDMLS and CLAW by entering into reciprocal data-sharing agreements to

provide those two MLSs with access to listing records submitted into CRMLS. Furthermore, to the north MLSListings and BridgeMLS, which operate in the Silicon Valley and the Oakland areas of California, also receive access to all CRMLS listing records.

**2. OneKey**

35. OneKey values the same market-making and efficiency-enhancing role in the real estate marketplace. OneKey serves approximately 40,200 real estate professionals and consumers across the Hudson Valley, Long Island, and the New York City boroughs of Manhattan, Brooklyn, Queens, and the Bronx. Its database contains more than 34,000 active listings and more than four million historical listings, including more than 2.2 million closed transactions, and in 2025 alone more than 125,000 properties were listed through OneKey. OneKey's participants share their listing data so that brokers of every size can compete for clients based on their services, expertise, and value, and so that buyers can learn about properties listed by different firms and sellers can reach prospective buyers represented by those firms. OneKey also makes its listing data available to participants for valuation purposes, including automated valuations. OneKey Rule 605.4. Like CRMLS, OneKey licenses its listing records for use by participants in the operations of their back-office systems, and again, Compass holds such a license to this data feed of information.

36. Like CRMLS, OneKey also operates as a cooperative venture. OneKey describes itself as "a service by which its Participants share their Listing data and invite other Participants to enter into cooperative relationships with them for the sale of their listings and provide information necessary to permit such cooperation," and its stated goals are "to facilitate cooperation among [its] Members, and to provide a convenient real estate data-sharing system, with complete, accurate, and up-to-date data." OneKey Rule 200.

37. OneKey's rules are established through a governance process rather than dictated by any single brokerage. Amendments to the rules are considered and approved by OneKey's Board of Managers, which includes three independent outside managers, and alleged violations are reviewed by a Rules and Procedures Committee made up of twenty-four Participants from OneKey's local Realtor® associations, the Hudson Gateway Association of Realtors® and the Long Island Board of Realtors®. OneKey Rules 202.1(b), 1001, 1201. Each Participant agrees in writing to abide by OneKey's Rules and Procedures as a condition of participation. OneKey's rules apply equally to all participants.

**B. Compass and Other Brokerages**

38. Turning to the subscribers to the MLS, residential real estate brokerage firms take on oversight and legal responsibility for agents, providing agents with training, tools, and marketing materials, among other services. Traditionally, agents are not employees of their brokerages but, instead, operate as independent contractors. Brokerage firms, including Compass, have a duty, through their responsible brokers, to supervise their affiliated agents' real estate brokerage activities. *See* 19 N.Y.C.R.R. § 175.21(a); Cal. Code Regs. tit. 10, § 2725.

39. Compass is the largest real estate brokerage firm in the United States. It was originally founded in 2012 and, upon information and belief, grew quickly by paying highly productive agents and teams working for competing brokers, among other things, large bonuses and stock options to abandon their existing brokerage firms to join Compass. Compass's growth then continued via numerous mergers with and acquisitions of its competing brokerage firms. In quarterly earnings reports, Compass has continually asserted that its size and continued growth provide it a competitive advantage in the market by controlling the inventory of for-sale properties. In a Q4 2024 Earnings Call on February 18, 2025, CEO Robert Reffkin stated that

"[d]epth of inventory, not breadth" is what will set Compass apart from its competitors, and he went on to state: "By growing our unique inventory and marrying that with our end-to-end platform, which has agent-level search and consumer search at a level that no other brokerage firm in the industry has, we believe that more and more buyers will search Compass.com and use Compass agents, as it will be known that Compass has more inventory than any other website or brokerage." Compass has been a participant in CRMLS since 2015, and it has been a participant in OneKey since OneKey's formation in 2020.[2] Hiding for-sale properties from CRMLS and OneKey, and from their cooperating brokers and agents, to force consumers to instead use a Compass agent is a specific and stated goal of Compass.

40. Across the country, Compass operates real estate brokerage businesses with tens of thousands of real estate agents, more than any other brokerage. Following Compass's January 2026 completion of its acquisition of Anywhere Real Estate Inc., Compass currently operates a brokerage firm of about 85,000 agents (Compass and Coldwell Banker, among other brands, combined) and a U.S. franchise business that has more than 126,000 real estate agents in its franchisee system.

41. Compass earns revenue by collecting a share of the gross sales commissions that its affiliated agents earn from home sales when representing either the buyer or seller of a home. In 2025, Compass reported closing 250,360 residential real estate transactions for a gross transaction value of $267 billion.

42. Compass is in the process of implementing a nationwide and branded "3-Phased Marketing Strategy." The three phases include:

a. <u>Compass Private Exclusive</u>: In phase 1, the seller and agent privately market the property to other agents and their clients. Just as many companies test products

[2] Prior to 2020, Compass participated in OneKey's predecessor MLSs, the Hudson Gateway Multiple Listing Service ("HGMLS") and the Multiple Listing Service of Long Island ("MLSLI").

> with a smaller audience before launch, listing a home as a Private Exclusive allows a seller to test price, gain critical insights, and generate early demand before going public.
>
> b. <u>Compass Coming Soon</u>: In phase 2, the listing moves to "Coming Soon" status and is publicly launched on Compass.com, showcasing it to all agents and consumers without displaying days on market, price drop history, or other negative insights. This is a signal to prospective buyers that increased competition for the listing will be coming soon when it is launched on all other sites, and it provides another chance for the seller and agent to collect valuable feedback.
>
> c. <u>Active on MLS and Home Search Portals</u>: The final phase is going active on the MLS and third-party sites, now armed with the benefit of price discovery and other information gained from Phases 1 & 2. With the listing live on the MLS and third-party sites, it will, for the first time, accrue days on market, visible price drop history, and other negative insights created by platforms like Zillow.

Complaint, *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Dkt. No. 15 ¶ 57.

**C. NAR's Clear Cooperation Policy and Its Procompetitive Purposes**

43. Throughout 2018 and 2019, CRMLS received complaints from its subscribers representing buyers expressing frustration and asking for new policies requiring cooperation by listing agents. Agents who worked with a buyer (for example, by helping the buyer get qualified for a loan and touring properties on multiple occasions) would receive calls from buyers annoyed that the agent had failed to share with them a for-sale property in the neighborhood in which they had been searching. Buyers complained that they saw advertised properties via lawn signs, social media, or website advertising. The buyer's agent would then search the CRMLS database, only to find no active for-sale information about the property identified by their client. In their complaints to CRMLS, these buyer agents described reaching out to the listing agent by text, email, or phone call. Most of the time, however, the CRMLS subscriber would receive no response from the listing agent, or, in the rare instance of a call back, the listing agent would offer a referral fee between $500 and $1,000 for the CRMLS subscriber to hand over the buyer to the listing agent. With no information to assist their buyer client, and with the listing agent controlling

access to the seller and property (because of the exclusive commission agreement), the buyer would be left with no choice but to abandon their preferred buyer agent and deal with the listing agent to see the property.

44. In response to, among other things, a significant rise in uncooperative seller agents hiding listings from the MLS cooperative, on November 11, 2019, the National Association of Realtors ("NAR") adopted the Clear Cooperation Policy as MLS Statement 8.0. CRMLS and OneKey each subsequently adopted and implemented their respective Cooperation Rules as part of their MLS rules implementing the NAR policy.

45. The NAR Clear Cooperation Policy provides: "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." Public marketing is defined to include, among other things, "flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public."

46. CRMLS Rule 7.9 implements NAR's Clear Cooperation Policy, stating similarly, "Within one (1) business day of marketing or advertising a residential property to any member of the public for sale which contains one to four units, . . . the Listing Broker must submit the property into the MLS for cooperation with other CRMLS participants." According to CRMLS Rule 7.9, "Marketing and advertising includes, but is not limited to, any information about the property or its availability for sale displayed on any: signs, websites, social media, brokerage or franchise operated websites, communications (verbal or written), multi-brokerage or franchise listing sharing networks, flyers or written material, on any applications, or by conducting an open

house." Rule 7.9 further provides that any individual or entity that has signed, within the previous year, an agency disclosure form identifying the Listing Broker is not a "member of the public" under the rule. *See* Exhibit B.

47. OneKey Rule 302.2 implements the NAR Clear Cooperation Policy. It provides that "[w]ithin one (1) business day after a property is publicly marketed, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants." Public marketing "includes, but is not limited to, any activity that makes the property available to the general public or to multiple brokers through a single communication or broadly distributed promotion," such as "flyers displayed in windows, yard signs, advertising on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing such as email distributions, multi-brokerage listing sharing networks, applications available to the general public, or any similar form of public promotion." "Individual, one-to-one communications between a listing broker and another broker regarding a specific property do not constitute public marketing." OneKey Rule 302.2(a). Commercial, nonresidential properties are not subject to the rule. *Id.* 302.2(b).

48. Among other key issues, the Cooperation Rules address a critical free-rider problem that threatened to undermine the entire cooperative structure of the MLS. Before the Cooperation Rules, some brokerages were accessing the comprehensive listing data provided by MLS participants while simultaneously withholding their own listings from the MLS, including many listings which were publicly marketed outside of the MLS but not accessible to all other participating brokers, as well as consumers. In 2018 alone, over 9,000 for-sale properties were marketed to the public before being submitted for cooperation to CRMLS. This practice allowed certain brokerages to benefit from the cooperative data pool without contributing to it, thereby

degrading the value of the key service CRMLS provided for all other participants and the consumers they serve. Throughout 2019, CRMLS received weekly complaints from buyer agent subscribers who had inquired with the non-cooperating advertising agent about for-sale properties but failed to receive any response. In short, those non-cooperating agents were hoarding their listings, while still benefiting unfairly from the listings of the cooperative. In some cases, the advertising listing agent would respond, but would require the inquiring buyer agent to refer the potential buyer client over to the advertising seller's agent in exchange for a referral fee, and if the buyer's agent refused, the advertising seller agent would refuse to deal. Buyer agents complained to CRMLS that their buyer clients were forced to abandon their representation and engage with the advertising seller's agent as the only way for the buyer to gain information or access to the for-sale property. These buyer agents questioned whether they should continue to use the CRMLS cooperative if CRMLS failed to enforce rules that would protect the concepts and principles of cooperation in a practical and meaningful way.

49. As the *Compass v. Zillow* court recognized, such practices could "degrade [a platform's] ability to obtain fresh, comprehensive, and accurate listings; encourage freeriding; fragment the real estate market; and limit transparency." *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Op. and Order, Dkt. No. 184 at 13-14.

50. The Cooperation Rules do not result in any harm to competition, which is required to bring any Section 1 claim, as Compass threatens.

51. In fact, the Cooperation Rules serve several important procompetitive purposes:

a) <u>Market Transparency and Information Quality</u>. By requiring that publicly marketed listings be promptly submitted to the MLS, the Cooperation Rules reduce hidden inventory and improve the completeness, accuracy, and timeliness of market information

available to all participants and consumers. This transparency benefits both buyers, who gain access to a fuller picture of available properties, and sellers, who benefit from the most efficient pricing mechanism. Sellers also benefit from the broadest potential access to their property and from assurance that they are likely receiving the best possible price for their property—as even the Butters Report confirmed over 40 years ago. In addition, this market transparency and information quality benefits brokers representing (or seeking to represent) sellers and buyers. First, competing selling brokers can access the MLS's comprehensive database of listing information and determine the most accurate potential pricing and marketing plan for a property, thus helping them obtain potential seller representations. Second, brokers representing buyers (as noted in the 2007 Competition Report) can compete effectively for buyers knowing that they can provide access to the full complement of MLS listing information and advise their potential buyers knowing that they have access to the vast majority of available listings in the MLS. By accessing the MLS, even a sole proprietor brokerage can obtain access to the entire inventory of listings in the same way that agents at the largest brokerage can, thus ensuring consumers have a choice of which brokerages they want to employ.

b) Increased Output and Broader Access. The Cooperation Rules increase the output of the MLS by ensuring that publicly marketed listings are available to all participants. This broader access means more buyers see more listings, leading to more efficient matches between buyers and sellers and ultimately to more completed transactions.

c) Preservation of the Cooperative Product. The MLS depends on the broad, prompt contribution of listing data by its participants—indeed, like many other efficiency enhancing products, the MLS depends on the network effect of having all participating brokers submitting their listings in accordance with the established rules and regulations of the MLS. Without the

Cooperation Rules, the value of the MLS would degrade as participants withhold publicly marketed listings, transforming the MLS from a comprehensive marketplace into an incomplete and unreliable data source.

d) Prevention of Free-Riding. Brokers who access MLS data to assist buyer clients or develop valuation opinions while withholding their own publicly marketed listings from the MLS are free-riding on the contributions of other participants. The Cooperation Rules prevent this free-riding by requiring that the benefits of the cooperative system flow in both directions. Thus, the Cooperation Rules prevent a brokerage from obtaining access to all other cooperating brokerages' listing information, while at the same time refusing to share its listing information with the balance of the cooperative. In addition, brokers access CRMLS data to develop and create comparative market analyses (CMA) for potential sellers by using the MLS listing records of past sales and current for-sale properties (including access to on average 34 photos per listing), and detailed sales information (like closed sale price, dates related to marketing time, and information about provided concessions to compare to the home that they are trying to value). Brokers then use the CMA to convince a seller to retain their services and recommend pricing and advice on timing and other transactional elements impacting the seller. The Cooperation Rules thus prevent non-cooperating brokers from benefitting from the fruits of the labor of the cooperative while refusing to submit their own for-sale property information, which those other brokers then cannot incorporate into their CMAs—in short, the non-cooperating broker has an unfair information advantage by refusing to abide by the Cooperation Rules.

e) More vigorous competition amongst competing, participating brokerage firms. Regardless of the size of the firm, brokers participating in the MLS are able to service any potential buyer because they maintain access to the vast majority of inventory in a service area.

As a result, brokers representing buyers are forced to compete on the quality of their skills, experience and, critically, *on pricing*, rather than buyers being forced to use a specific broker just to gain access to information or to gain access to see a specific property. Moreover, because of the Cooperation Rules, brokers participating in the MLS reduce the costs of matching a potential buyer to a potential seller, and can market their services to a large set of potential customers.

f) Consumer protection from conflicts of interest of the seller's broker. Hiding a for-sale property from the MLS allows a seller agent to use an exclusive commission agreement to prevent any other competing buyer brokers with interested clients from accessing the for-sale property or its seller. This practice also allows the seller's agent to control advertising, marketing and buyer leads exclusively, which the seller's broker may leverage for their own financial benefit, and to the detriment of the seller. For example, Compass has an exclusive marketing agreement with Redfin.com, under which, upon information and belief, Redfin/Rocket provides financial benefits and favored treatment to its horizontal competitor Compass, in exchange for Compass providing for-sale property advertisements exclusively to Redfin.com. Compass only receives these financial incentives for properties that are not sent by Compass or the MLS to Zillow.com, Realtor.com, Homes.com, or any of the CRMLS distributed websites, which total over 22,000. The value Compass extracts comes from hiding the for-sale property from these competing sites. The potential buyer views of the for-sale home advertisements are many times greater on the excluded sites than on Redfin.com or Compass.com alone, causing the seller to lose valuable marketing opportunities just so the listing broker can generate additional revenue from hiding the for-sale property from the MLS and competing websites.

52. The procompetitive nature of the Cooperation Rules has been recognized by the market itself. Anywhere Real Estate, Inc., which was the nation's largest real estate holding

company for many years, *and is now also owned by Compass*, warned in its 10-K for fiscal year 2024 that changes to the Cooperation Rules "could, among other things, reduce the availability of broadly listed properties, leading to more unlisted inventory and potentially limiting access to comprehensive housing market data." This acknowledgment by a major industry participant, which is now part of Compass, confirms that the Cooperation Rules serve to maintain market transparency and data quality—core procompetitive values.

53. The MLS is a legitimate cooperative venture, and the Cooperation Rules are internal rules governing the core product of that venture. Under *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), internal decisions of a legitimate joint venture regarding its core product are not subject to *per se* antitrust condemnation. The Cooperation Rules govern the terms on which participants contribute to and benefit from the MLS's cooperative data pool—a quintessential internal venture decision.

### D. Non-Exclusive Listing, "No Cooperation Listings," and Limited Marketing Options

#### 1. CRMLS

54. Importantly, CRMLS Rule 7.9, which requires for-sale property submission for cooperation upon public marketing, is limited to only properties subject to an exclusive commission agreement. An exclusive commission agreement prevents any competing agent from interacting with or communicating with a seller under the National Association of Realtors Code of Ethics, Article 16, Standard of Practice 16-13. Under an exclusive agreement, it is the fact that a seller's agent will be paid, even if that seller's agent fails to procure the buyer, that provides the necessary incentive and protections for that seller's agent to submit the for-sale property to the MLS cooperative.

55. Brokers may also enter into non-exclusive agreements, where they are only paid compensation from their seller if they procure a buyer for the property. Public marketing of a for-sale property subject to a non-exclusive agreement protects the seller from an unethical agent that may hide interest and/or inquiries from potential competing buyer agents. With a non-exclusive agreement in place, the seller and the seller's agent are subject to the open marketplace, so if the seller's agent refuses to cooperate, refuses to deal, or hides the interests of the buyer agent's inquiry from the seller, then the buyer's agent may go to the seller directly and may deal directly with the seller to show the property and present an offer from the buyer agent's client. Rule 7.9 presents a fair balance: exclusive agreements restraining access to the seller are paired with mandatory submission to the MLS for cooperation, while a seller who does not wish to use the MLS to market the home remains free to do so without the restraint of an exclusive commission agreement, ensuring that the for-sale property remains in the open marketplace.

56. A "No Cooperation Listing" (Rule 7.9.1) is one for which the seller has instructed the Listing Broker in writing to do no marketing or advertising as defined by Rule 7.9 and not to disseminate the listing in the MLS. The seller's instruction must include an advisory that the seller is aware that, among other things, other brokers and their buyer clients may not be aware the property is for sale and that the reduced exposure may lower the number of offers and adversely impact the price. A seller who wishes to limit the access of his or her property to a single brokerage, and still wants to sign an exclusive commission agreement, may do so without triggering any obligation under the CRMLS Cooperation Rules.

57. The existence of both the non-exclusive agreement and No Cooperation Listing options is a critical feature of the CRMLS Cooperation Rules. These options ensure that the CRMLS Cooperation Rules do not compel any seller to list on the MLS. Rather, the CRMLS

Cooperation Rules require that if a seller and broker have an agreement that restrains buyer agents from accessing the seller while choosing to publicly market a property—reaching beyond the brokerage's own agents to the general public—the listing must also be shared on CRMLS so that all participants and their buyer clients can benefit from that information and opportunity.

58. The Cooperation Rules are integral to preventing free-riding by agents that want to hoard for-sale inventory for their own profit. If, as Compass now demands, a brokerage were permitted to publicly market a No Cooperation Listing (what Compass mistakenly calls an "office exclusive") without submitting it for cooperation in the MLS, the public marketing of the No Cooperation Listing would swallow the Cooperation Rules and defeat their procompetitive purposes. Indeed, Compass seeks to have its "cake and eat it too" by claiming that it should be allowed to withhold a No Cooperation Listing from submission to the MLS, but then be free to "publicly market" that listing outside the cooperative—in direct contravention of CRMLS rules.

59. To accommodate different sellers' preferences, CRMLS rules allow for many marketing options for sellers.

60. For example, CRMLS has a "Coming Soon" status as an additional option to sellers, which includes submitting the listing to CRMLS for cooperation, but no "days active on the MLS" are accrued. During the Coming Soon status, the property may be publicly marketed, and it is displayed to other participants in CRMLS, but the listing broker and seller volunteer to not show the property to any potential buyers. The "Coming Soon" status allows a seller to market a property and to create buzz and energy around its full access while the seller or listing agent prepares the property for viewing by the public. Since there are no tours or showings to potential buyers, the listing does not accrue "Days Active in MLS." In addition, a property may stay in the "Coming Soon" status for up to 21 days. Importantly, *all CRMLS users* can see "Coming Soon"

listings and are aware that the property may be coming to the marketplace shortly, so the for-sale property is part of the cooperative process.

61. Furthermore, CRMLS provides listing brokers with the option of making the listing fully "Active," meaning that the listing is displayed fully in the CRMLS database and fully distributed through IDX and VOW data feeds; "Days Active on the MLS" are counted; and showings of the property take place both by the listing broker and any other participant representing a buyer. As expected, all CRMLS users can see "Active" listings.

**2. OneKey**

62. Like CRMLS's No Cooperation Listing option, OneKey Rule 316 preserves a seller's ability to keep a listing out of the MLS entirely. A Participant may accept an "Office Exclusive Listing," provided the Participant has informed the homeowner about the benefits of the MLS and obtains a signed "Office Exclusive Seller Disclosure" confirming the seller's informed decision to withhold the listing from the MLS. OneKey Rules 102.8, 102.9, 316.1. Office Exclusive Listings are recorded with OneKey but are not disseminated to other participants, and they "remain on file with the Service as confidential material and the details shall not be disclosed to any third party." OneKey Rules 303.2, 316.1, 316.2. OneKey permits limited private marketing of an Office Exclusive Listing; only once the property is publicly marketed must it be shared with the cooperative under Rule 302.2.

63. OneKey also offers sellers a range of additional marketing options. Sellers may choose private listings, MLS-only exposure, or broad public distribution, and may elect to publicly market their properties without displaying the address or opt out of distribution to third-party syndication portals. In addition, OneKey's "Coming Soon – No Showings" status allows a seller up to fourteen days to prepare a property for showings while the listing is displayed in the

MLS system, on IDX and VOW websites, on the listing participant's own website, and on social media, but not syndicated to third-party advertising websites. OneKey Rule 302.3. Importantly, during this "Coming Soon" phase, the property cannot be shown for sale to prospective buyers unless it is switched to "Active" making it available to all OneKey participants. Once a listing is switched to "Active," its "OnMarketDate" resets, meaning that the Days on Market count returns to zero, although an IDX website may still display "Days on Site" for the entire period the listing was available on that site. Likewise, when a listing moves from MLS-only status—in which the listing is in the MLS for cooperation but is not displayed on the internet, akin to the traditional NAR internet opt-out—to public display, the Days on Market count is reset to zero and no price-change history is transmitted to the public through OneKey's data feeds. Because the public is seeing the listing for the first time, history associated with the listing's prior, non-public status is not displayed.

64. These options ensure that the OneKey Cooperation Rules, like the CRMLS Cooperation Rules, do not compel any seller to list on the MLS. The OneKey Cooperation Rules preserve the listing options recognized by New York law while requiring participants who choose to publicly market a property to share it with the cooperative marketplace.

**E. Compass's Threatened Litigation Against CRMLS and OneKey**

65. On September 8, 2026, Nathan P. Eimer, of Eimer Stahl LLP, acting as counsel for Compass, sent the Demand Letter to Art Carter, the Chief Executive Officer of CRMLS. That same day, Mr. Eimer sent the OneKey Demand Letter to Richard Haggerty, the Chief Executive Officer of OneKey. The OneKey Demand Letter followed an August 27, 2026 email from Compass's Chief Legal Officer, Ethan Glass, to which OneKey had responded that any proposed change to its rules would need to proceed through OneKey's established rule-amendment process.

The OneKey Demand Letter is substantially similar to the Demand Letter sent to CRMLS, differing principally in its references to OneKey and OneKey's rules.

66. In the Demand Letters, Compass asserted that each of CRMLS and OneKey is violating the U.S. antitrust laws by fining real estate professionals for publicly marketing an office exclusive listing "and by threatening further punishment, such as suspension or expulsion from the MLS." As to OneKey, Compass asserted that OneKey fines real estate professionals "up to $15,000," citing OneKey Rule 902.2. That figure is the general ceiling on sanctions for any rule violation; the automatic fine for a violation of Rule 302.2 is $2,500, plus $100 for each day the violation remains uncorrected. OneKey Rules 1101, 1103, 1104 (Note D).

67. CRMLS rules have no "office exclusive" category, but CRMLS understood this to mean No Cooperation Listings per Rule 7.9.1. OneKey understood the demand to refer to Office Exclusive Listings under OneKey Rule 316 that are publicly marketed without being submitted for cooperation as required by OneKey Rule 302.2. Compass demanded that each MLS provide written confirmation by 5:00 PM ET on October 6, 2026 that it would not fine or punish a real estate professional for publicly marketing office exclusive listings, and threatened that each MLS would otherwise be "named as a defendant in a federal antitrust lawsuit."

68. The Demand Letters asserted that each MLS's prohibition on public marketing of office exclusives "is a horizontal agreement among competitors—a joint restraint adopted and enforced by competing brokers acting through the MLS." Compass contended that MLS membership is "not voluntary" but rather "a requirement of trade," and argued that each MLS is "controlling how real estate professionals and homeowners . . . act off of your platform."

69. In the Demand Letters, Compass cited the Fourteen Points antitrust policy discussed in the FTC's 1983 report and argued that fining and punishing real estate professionals

for publicly marketing office exclusives had "returned [the MLS] to the days before the Fourteen Points." Compass further referenced its lawsuit against Northwest Multiple Listing Service (described further below) and identified several MLSs that it claimed allow public marketing of office exclusives, including Bay Area REIS, Bright MLS, Garden State MLS, and MetroList. Compass closed by declaring that it "will spend millions of dollars to sue" CRMLS and OneKey, respectively, "and other MLSs to accomplish those goals."

70. The Demand Letters were copied to the Antitrust Division of the U.S. Department of Justice and the Bureau of Competition of the Federal Trade Commission, and included document preservation notices—further underscoring Compass's intent to pursue litigation if CRMLS and OneKey did not accede to its demands.

71. CRMLS responded to the Compass Demand Letter on September 30, 2026. *See* Exhibit C. CRMLS explained that its rules do not prohibit public marketing, that Rule 7.9 instead prevents free-riding by agents who use competitors' contributed listing data and then hide their own exclusively listed properties from the cooperative, and that Compass had made an almost identical demand in November 2024. CRMLS also noted that, only days before sending the Demand Letter, Compass had settled its lawsuit against Northwest Multiple Listing Service on terms requiring submission of for-sale properties for cooperation that are more restrictive than CRMLS Rule 7.9.

72. On October 20, 2026, OneKey responded to the OneKey Demand Letter, rejecting its factual assertions and legal conclusions and declining to make the requested changes. OneKey explained that "[s]eller choice and an open, fair, and competitive marketplace can—and should—coexist," distinguishing a seller's decision to limit a property's exposure from a participating brokerage's demand to publicly market that property while withholding it from the MLS

cooperative. OneKey explained that neither the historical recognition of office-exclusive listings nor the authorities Compass cited establishes an unrestricted right to engage in the latter practice. ***See*** Exhibit H. OneKey further explained that reciprocal sharing enables brokerages of every size to compete based on their services, expertise, and value, rather than exclusive control over listing information. Allowing a brokerage to access competitors' contributed listings while withholding its own publicly marketed listings would create a free-riding problem, risk giving larger brokerages an information advantage over smaller competitors, and undermine transparency and consumer access. OneKey emphasized that its "rules protect competition, not any particular brokerage or business model," and that it would "continue to uphold and appropriately enforce its policies in accordance with applicable law." *See* Exhibit H.

73. Compass has sought a similar one-sided arrangement for other uses of OneKey's cooperative data. On September 23, 2026, Victor Lund, writing from a Compass email address on behalf of Compass International Holdings and its affiliated brands, demanded that OneKey exclude those brands' listing and agent data from feeds supplied by OneKey to third-party technology vendors whose products help brokerages identify and recruit agents. Mr. Lund asserted that "[m]andatory listing submission to the MLS" in these circumstances "results in damage claims to the MLS" and offered to "release any claims" if OneKey implemented the demand within thirty days. Yet Compass itself licenses OneKey's cooperative listing data for its own back-office operations. Compass thus seeks to use competitors' contributed data to support its business while restricting competing brokerages' use of Compass-contributed data to support theirs. Like its demand to publicly market listings while withholding them from the MLS, this request seeks the benefits of the cooperative without reciprocal sharing—another attempt to free-ride on the cooperative.

74. In addition, CRMLS operates a compliance department that processes reports of all manner of CRMLS Rule violations to keep the MLS data as accurate as possible, with an average of 25,000 reports annually. Only a small percentage of those reports relate to Rule 7.9-failure to submit a listing upon public marketing. In 2025, CRMLS issued 89 fines for violation of Rule 7.9, with only 8 of those going to a Compass agent. For context, CRMLS had over 271,000 listings enter the system in 2025. To date in 2026, CRMLS has processed approximately 300 cases related to violations of Rule 7.9, with about 75 of those involving a Compass for-sale property. CRMLS has noticed a significant increase in reports against Compass since the spring. As of the date of filing, CRMLS has ten open cases involving Compass agents, with eight of those having been appealed by the violating Compass agent. CRMLS had approximately 25 cases where Compass violated Rule 7.9 and for which CRMLS did not issue a fine to Compass. This occurred during the period when CRMLS was implementing its new Coming Soon Limited Exposure process, so CRMLS did not issue citations or fines in an effort to assist Compass in educating its agents to use the new option CRMLS created at Compass's request. Additional reports of Compass advertising for-sale properties while failing to submit those same properties to CRMLS for cooperation continue to be received for future processing.

75. OneKey likewise enforces Rule 302.2 through its established rules-enforcement process, under which fines for violations are subject to Written Administrative Review, a hearing before a panel of the MLS Rules and Procedures Committee, and appeal to the Board of Managers. OneKey Rules 901–902, 1201–1210. A violation of Rule 302.2 carries an automatic fine of $2,500, plus $100 for each day the violation remains uncorrected, a penalty structure that has remained unchanged since OneKey's formation. OneKey Rules 1101, 1103, 1104 (Note D). OneKey has enforced Rule 302.2 uniformly across its service area, without regard to the identity

of the participating brokerage. Since January 2025, OneKey has issued 156 fines for violations of Rule 302.2—93 in 2025 and 63 to date in 2026—to 90 different participating brokerage offices, ranging from sole-office firms to the largest brokerages in its service area. Only five of those fines were issued to Compass. OneKey's enforcement process is also measured, fair, and not punitive. Of the approximately $407,800 in total fines issued, approximately $307,400 has been waived, and roughly two-thirds of all fines (104 of 156) were waived by OneKey staff, often upon a showing that the listing had been promptly submitted or that submission was not required. Other fines were reduced or overturned through Written Administrative Review or following a hearing. Consistent with that approach, of the $13,800 in fines issued to Compass, $9,300 has been waived through staff waiver, administrative review, or hearing determination; only a single fine, reduced by a hearing panel to $1,500, has been paid, and one fine, issued on September 21, 2026, remains unpaid.

76. Compass's threatened litigation against CRMLS is part of a broader pattern. Compass had previously demanded that CRMLS remove the Cooperation Rules entirely in 2024. Specifically, in November 2024, Compass demanded that CRMLS remove the Cooperation Rules or face an antitrust lawsuit in January of 2025. *See* Exhibit D. CRMLS evaluated the antitrust claims made by Compass and concluded that removing the Cooperation Rules and implementing the rule modifications Compass demanded could subject CRMLS to potential antitrust liability from buyer agents and buyers, and to potential intentional misrepresentation claims from sellers. In a lengthy email, dated December 3, 2024, CRMLS rejected Compass's demand to modify the Cooperation Rules and detailed its antitrust concerns arising from CRMLS's potential participation in an agreement to create rules for the benefit of giant brokers and their preferred business model. *See* Exhibit E.

77. Compass's threats against OneKey likewise predate the OneKey Demand Letter by months. On March 20, 2026, OneKey issued a notice to its participants explaining the listing options available to sellers within OneKey, including full public marketing, Coming Soon status, MLS-only configurations in which a listing is shared within the MLS but not broadly displayed, and private or office exclusive listings. The next day, March 21, 2026, Compass's Chairman and CEO, Robert Reffkin, wrote directly to OneKey's Chief Executive Officer, copying Compass's Chief Legal Officer, Ethan Glass. Mr. Reffkin asserted that OneKey's rules are "an illegal restraint of trade," declared that Compass is "on a clear path to pursue antitrust claims with three times damages (treble damages) if MLSs continue using their monopoly control to restrict seller choice," and demanded that OneKey adopt the public marketing policies of other MLSs or "just stop fining agents for publicly marketing off-MLS." Mr. Reffkin warned that "litigation is likely to start next month." *See* Exhibit I.

78. On March 24, 2026, OneKey responded that it disagreed with several of Mr. Reffkin's assertions, that OneKey offers sellers multiple listing-exposure options and supports transparency for buyers, and that it remained open to dialogue through its normal governance channels. The same day, Mr. Reffkin replied with a draft public statement that again characterized MLS enforcement of "Clear Cooperation" rules as coercive and demanded that OneKey make three changes to its rules. *See* Exhibit I. Compass's subsequent August 27, 2026 email and September 8, 2026 OneKey Demand Letter renewed the same demand. Thus, as with CRMLS, OneKey has repeatedly declined Compass's demands, and Compass has repeatedly escalated its threats of litigation.

79. The reality and immediacy of this controversy are underscored by Compass's pattern and practice of bringing antitrust claims against MLSs and other parties that maintain rules

similar to the Cooperation Rules. Compass recently sued the Northwest Multiple Listing Service ("NWMLS"). *See Compass, Inc. v. Nw. Multiple Listing Serv.*, No. 2:25-cv-00766, 2026 WL 776138 (W.D. Wash. Mar. 19, 2026). NWMLS and Compass ultimately entered a settlement whereby NWMLS agreed to change certain of its rules related to for-sale listing distribution, but not its requirement that before a real estate listing could be publicly marketed, it had to be provided to NWMLS for inclusion for cooperation in its database of available properties. Compass's Demand Letters expressly cited the NWMLS litigation as precedent for its threatened action against CRMLS and OneKey, but neglected to mention this key provision in its settlement with NWMLS.

80. Additionally, in *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Compass brought antitrust claims against Zillow, Zillow Group, Inc., and Trulia, LLC, alleging that Zillow's Listing Access Standards violated Sections 1 and 2 of the Sherman Act. Compass sought a preliminary injunction to enjoin Zillow's implementation of display standards that excluded from Zillow's platform listings that had previously been advertised and marketed before submission to the local MLS in violation of the Cooperation Rules. That court denied Compass's motion for a preliminary injunction on February 6, 2026, finding that Compass had failed to demonstrate a likelihood of success on the merits of its Section 1 claim and had not made a clear showing that Zillow possessed monopoly power in the online home search market. Compass subsequently dismissed the action.

81. Taken together, these cases and Plaintiffs' concerns arising from Compass's demands to create rules favorable to giant brokers demonstrate a broad pattern of conduct whereby Compass is engaged in a ceaseless campaign to limit access to residential real estate listings and to force both consumers and brokers to use a Compass-affiliated agent simply to gain access to

information about a for-sale property. In the NWMLS litigation, Compass sought to prevent an MLS from enforcing rules requiring that publicly marketed listings be shared on the MLS. And in the *Compass v. Zillow* litigation, Compass sought to prevent Zillow from implementing listing standards that promoted transparency and access consistent with the same principles as the Cooperation Rules. In each case, Compass's conduct was directed at undermining rules or policies designed to ensure transparency and broad access to listing information, and to benefit itself—a giant brokerage with a large inventory of for-sale properties. This pattern underscores the credibility of Compass's threat to bring similar claims against CRMLS, OneKey, and other MLSs that received copies of the Demand Letters.

82. In addition, Compass's CEO has recently made public statements and published social media posts—including one stating unequivocally that Compass intended to file a lawsuit against CRMLS concerning the issues raised in this declaratory judgment action.

83. Compass has publicly signaled its intent to pursue similar litigation against other MLSs, including OneKey. The Demand Letters make clear that Compass is contemplating litigation against other MLSs across the country. Moreover, upon information and belief, similar demand letters were also sent to numerous other MLSs across the country, including the same threat that each of those MLSs cease the enforcement of its rules relating to the submission of "office exclusives" that are publicly marketed, and threatening those MLSs with a federal antitrust lawsuit if they failed to capitulate.

84. Compass is a OneKey participant, and its affiliated agents are OneKey subscribers. OneKey therefore faces the same choice that CRMLS faces: continue to enforce rules its participants adopted and abide by, and face the litigation Compass has expressly threatened, or abandon those rules and expose itself to potential claims from buyers, buyer agents, and the many

participating brokerages that contribute their listings to the cooperative. Mr. Reffkin's September 30, 2026 statement that Compass would begin suing MLSs across the country that did not capitulate applies with equal force to OneKey.

85. Compass has since carried out its threat against CRMLS. On October 16, 2026, just 11 days after this suit was initially filed, Compass, Inc. and two of its California brokerage subsidiaries sued CRMLS in the United States District Court for the Central District of California, asserting claims under Section 1 of the Sherman Act and the Cartwright Act that challenge CRMLS Rules 7.8 and 7.9. *See Compass, Inc. v. Cal. Reg'l Multiple Listing Serv., Inc.*, No. 5:26-cv-06121 (C.D. Cal. filed Oct. 16, 2026). That filing confirms that the identical threat Compass made against OneKey is real and imminent.

**F. History of Antitrust Enforcement Regarding MLS Rules**

86. The federal government has a long history of engagement with competition issues in the residential real estate industry. The Fourteen Points, first articulated by NAR in 1971 in response to Justice Department consent orders and later analyzed by the FTC, established a framework for evaluating the antitrust implications of MLS rules. The Fourteen Points addressed concerns that mandatory listing submission rules could restrict the competitive freedom of broker-members, and provided, among other things, that MLSs should not prohibit office exclusives, which neither the CRMLS Cooperation Rules nor the OneKey Cooperation Rules prohibit.

87. Published in 1983, the FTC's Butters Report provided a comprehensive analysis of the residential real estate brokerage industry. The Butters Report recognized the procompetitive benefits of the MLS system while also noting that "office exclusives" allowing sellers to withhold listings from the MLS "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings." The Butters Report at

130. The Cooperation Rules' preservation of the "office exclusive" exception is consistent with this insight. CRMLS's specific adoption of "No Cooperation Listings" and the non-exclusive commission agreement options it offers participating brokers, and OneKey's Office Exclusive Listing option, implement these policy decisions.

88. The FTC's 1983 Butters Report also highlighted the exact problem with "vest-pocket" listings—which is exactly what Compass now demands of CRMLS and OneKey—stating: "While there may be cases where a seller does not want his or her listing submitted to the MLS, the MLS remains the most efficient method of maximizing exposure of property in large markets. Historically, however, a common problem for sellers and for the MLSs has been 'vest pocket' listings. An ability to easily withhold underpriced listings may increase the incentives of some brokers to undervalue listings initially. Thus, one rationale for mandatory listing requirements traditionally has been that it helps in suppressing a practice which can do substantial injury to consumers." *Id.* at 130.

89. In 2007, the DOJ and FTC jointly published a report on competition and real estate, further documenting the federal government's engagement with these issues. As noted above, the 2007 Competition Report examined various MLS rules and practices and their effects on competition, reaffirming the government's recognition that MLS rules can serve procompetitive purposes when properly structured.

90. Indeed, as the *Zillow Group, Inc. v. Midwest Real Estate Data, LLC* court recently noted, the DOJ's 2008 consent judgment with NAR established an "'objective criteria' requirement" for MLS data feeds, and subsequent DOJ enforcement has focused on ensuring that "NAR's policy requiring listings to be placed immediately into an MLS" does not "restrict competition from alternative brokerage and listing models." No. 1:26-cv-5451 (N.D. Ill. Sept.

16, 2026), Memo. Op. and Order, Dkt. No. 141 at 44. The DOJ's approach confirms that federal enforcement has sought to refine mandatory MLS submission rules such as the Cooperation Rules, not eliminate them.

91. Finally, in the Supplemental Statement of Interest it filed in the action, *Nosalek v. MLSpin, et al.*, No. 1:20-cv-12244-PBS (D. Mass.), Dkt. No. 358 at 7 n.2, the DOJ clarified that: "Of note, industry participants have made public statements about the Division's purported position on clear cooperation policies that are misleading and out of context. The Division has not taken a position that such policies standing alone (i.e., without mandated MLS publication of offers of compensation or exceptions benefitting primarily large brokerages) are anticompetitive" (emphasis omitted). CRMLS is informed and believes that this statement from the DOJ was directed at public statements made by Compass. Importantly, CRMLS eliminated "mandated MLS publication of offers of compensation" years ago, and OneKey removed its rules requiring publication of offers of compensation on August 8, 2024, and its rules now prohibit any offer of compensation through the MLS. *See* OneKey Rule 502. As noted above, Plaintiffs' rules seek to balance the interests of all brokerage firms, large or small, as well as the interests of sellers and buyers. Thus, neither Plaintiff's rules contain the compensation-related feature that would raise the concerns the DOJ identified in the *Nosalek* Statement of Interest.

**G. Prior Judicial Consideration of Transparency Rules**

92. In *Zillow Group, Inc. v. Midwest Real Estate Data LLC*, No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), the court similarly denied a preliminary injunction to Zillow, which had challenged restrictions on its access to MLS listing data. Significantly, the court held that "the Seventh Circuit has evaluated restrictions associated with multiple listing services under the rule of reason." 26-cv-5451, Dkt. No. 141 at 33. The court further found that where an MLS enforces

its own rules and "the record [does] not show that the rules were intended solely to suppress competition," *per se* treatment is inappropriate. *Id.* at 33. The court emphasized that "*[p]er se* treatment is therefore appropriate only where the restraint is 'manifestly anticompetitive' and experience permits the Court to condemn it without a detailed examination of its anticompetitive effects." *Id.* at 31 (citation omitted). Importantly, the court also found that the relationship between an MLS and brokerages *is vertical—"a supplier to recipient of inputs"—not horizontal*. *Id.* at 32. The court further held that "the existence of these plausible alternative explanations . . . prevents the Court . . . from characterizing the alleged agreement as a 'naked restraint of trade with no purpose except stifling of competition.'" *Id.* at 33 (citation omitted).

93. These recent holdings strongly support the conclusion that the Cooperation Rules are not a *per se* unlawful group boycott and, to the contrary, are critical to the procompetitive impact that MLSs have on the residential real estate marketplace.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT THAT THE COOPERATION RULES DO NOT VIOLATE SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

94. Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

95. An actual, justiciable controversy exists between each Plaintiff and Compass regarding whether its Cooperation Rules violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Compass has expressly threatened to bring federal antitrust claims against both CRMLS and OneKey on this basis. Moreover, each Plaintiff has to decide right now whether to continue to enforce its Cooperation Rules; worse, as MLSs affiliated with NAR, if either stops enforcing its Cooperation Rules, it faces potential penalties from NAR, including loss of its charter.

96. The Cooperation Rules do not violate Section 1 of the Sherman Act under the rule of reason. The rule of reason, not *per se* condemnation, is the appropriate framework for evaluating the Cooperation Rules because the Cooperation Rules are rules governing the internal operations of a legitimate cooperative venture—the MLS. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 3 (2006) (internal pricing decisions of legitimate joint venture not *per se* unlawful); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 (1984) (rule of reason applies where restraint is essential to the product's availability). Indeed, the Seventh Circuit "has evaluated restrictions associated with multiple listing services under the rule of reason." *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, Case No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), Dkt. No. 141 at 33.

97. Critically, the Cooperation Rules do not produce any anticompetitive effects. The rules do not raise prices, reduce output, exclude competitors from the market, or diminish innovation. To the contrary, the Cooperation Rules increase the output of the MLS by ensuring that publicly marketed for-sale properties are shared with all participants, thereby expanding the pool of available properties for buyers and the pool of potential buyers for sellers. The rules do not restrict any broker's ability to compete; they simply require that brokers who wish to benefit from the cooperative's data also contribute to it. Sellers retain complete freedom to choose whether to publicly market their properties, to use No Cooperation Listings or Office Exclusive Listings, or to enter into non-exclusive agreements that do not require MLS submission. And brokers of all sizes—from sole proprietors to the largest national firms—compete on a level playing field because they all have access to the same comprehensive listing data. In short, the Cooperation Rules promote competition rather than restrain it.

98. Under the rule of reason, the Cooperation Rules are lawful because they have substantial procompetitive justifications that outweigh any anticompetitive effects. The Cooperation Rules enhance market transparency, increase the output of the MLS, preserve the cooperative product, prevent free-riding, and ensure that consumers on both sides of the marketplace—home buyers and home sellers—benefit from comprehensive and accurate listing information. Courts have recognized that MLS rules serve the legitimate purpose of maintaining "fresh, comprehensive, and accurate listings," and that alternatives to the Cooperation Rules risk "fragment[ing] the real estate market" and "limit[ing] transparency." *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV-SDA (S.D.N.Y.), Dkt. No. 184 at 13-14.

99. The Cooperation Rules do not constitute a group boycott. A group boycott requires an agreement to exclude competitors from the market. The Cooperation Rules do not exclude anyone from the market; they require only that participants who publicly market for-sale properties while exclusively controlling access to the seller and property also share those properties on the MLS. Participants remain free to use No Cooperation Listings or Office Exclusive Listings, to use non-exclusive commission agreements, or to use only a single brokerage firm to find a buyer. The Cooperation Rules impose no restriction on any participant's ability to compete in the real estate brokerage market. Moreover, "antitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement." *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-5451 (N.D. Ill. Sept. 16, 2026), Dkt. No. 141 at 32 (citation omitted). As that court recognized, the relationship between an MLS and its participating brokerages is vertical—"a supplier to recipient of inputs"—not horizontal. *Id.*

100. No less restrictive alternative to the Cooperation Rules exists that would achieve their procompetitive objectives. Under the CRMLS Cooperation Rules, the non-exclusive commission agreement—which does not require submission for cooperation into the MLS because access to the property and seller remains unrestrained by an exclusive commission agreement—already provides a balanced accommodation that allows sellers the option to never place their for-sale property into the MLS while still conducting any marketing or advertising activity they desire. Under both sets of Cooperation Rules, sellers may keep a listing out of the MLS entirely as a No Cooperation Listing or Office Exclusive Listing. The CRMLS and OneKey Coming Soon statuses provide a delay to broad MLS exposure while ensuring that publicly marketed listings remain in the cooperative for access by buyer agents. Eliminating the Cooperation Rules altogether would reintroduce the free-rider problem and degrade the quality and comprehensiveness of the MLS's cooperative data pool.

101. Plaintiffs are concerned that submitting to Compass's demands to hide for-sale properties from the MLS and the marketplace, while the seller is prevented from interacting with any competing buyer agents because of the restraints of the exclusive commission agreement, will cause buyers or buyer agents to bring credible antitrust claims against them.

102. Moreover, unlike in prior situations with Compass, the threat of litigation is imminent—Compass provided a deadline of October 6, 2026, for purported compliance by CRMLS, and October 20, 2026 for OneKey, and its CEO made public statements at the CMLS Conference on September 30, 2026, stating Compass would file suit. In addition, the Demand Letters were copied to the DOJ and FTC and contained litigation-hold notices, Compass recently initiated litigation against NWMLS seeking similar relief, Compass has separately asserted that

OneKey faces "damage claims" arising from its mandatory listing submission requirements, and Compass has now sued CRMLS after the initial filing of this action.

103. In sum, the dispute is ripe, and Plaintiffs are entitled to a declaration that their respective Cooperation Rules do not violate Section 1 of the Sherman Act.

**SECOND CAUSE OF ACTION**

**DECLARATORY JUDGMENT THAT THE CRMLS COOPERATION RULES DO NOT VIOLATE THE CALIFORNIA CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16720)**

104. CRMLS incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

105. An actual, justiciable controversy exists between CRMLS and Compass regarding whether the CRMLS Cooperation Rules violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

106. Claims under the Cartwright Act are analyzed under the same standard as claims under the Sherman Act. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., was modeled after the Sherman Act." (citation omitted)).

107. For the same reasons set forth in the First Cause of Action, the CRMLS Cooperation Rules do not violate the Cartwright Act. The CRMLS Cooperation Rules are procompetitive rules that are not unlawful under the rule of reason, do not constitute a group boycott, and for which no less restrictive alternative exists.

108. CRMLS is entitled to a declaration that the CRMLS Cooperation Rules do not violate the California Cartwright Act.

## THIRD CAUSE OF ACTION

## DECLARATORY JUDGMENT THAT THE ONEKEY COOPERATION RULES DO NOT VIOLATE THE NEW YORK DONNELLY ACT (N.Y. GEN. BUS. LAW § 340)

109. OneKey incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

110. An actual, justiciable controversy exists between OneKey and Compass regarding whether the OneKey Cooperation Rules violate the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq.

111. The Donnelly Act was modeled on the Sherman Act and is generally construed in light of federal precedent. *See X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994).

112. For the same reasons set forth in the First Cause of Action, the OneKey Cooperation Rules do not violate the Donnelly Act. The OneKey Cooperation Rules are procompetitive rules that are not unlawful under the rule of reason, do not constitute a group boycott, and for which no less restrictive alternative exists.

113. OneKey is entitled to a declaration that the OneKey Cooperation Rules do not violate the New York Donnelly Act.

## PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

WHEREFORE, Plaintiffs CRMLS and OneKey respectfully request that this Court enter judgment in their favor, and grant the following relief:

A. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the Cooperation Rules do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the CRMLS Cooperation Rules do not violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.;

C. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the OneKey Cooperation Rules do not violate the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq.;

D. An injunction permanently enjoining Compass from bringing or pursuing any claim against CRMLS or OneKey alleging that the Cooperation Rules violate the federal or state antitrust laws;

E. An award of Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and

F. Such other and further relief as this Court deems just and reasonable, including preliminary and temporary relief, and fees and costs as may be requested or required.

Dated: October 27, 2026

Respectfully submitted,

*/s/ Claude G. Szyfer*
Claude G. Szyfer
Elai Katz
**HOGAN LOVELLS CADWALADER US LLP**
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 918-3100
claude.szyfer@hlc.com

Liam E. Phibbs (*pro hac vice forthcoming*)
Holden A. Steinhauer (*pro hac vice forthcoming*)
**HOGAN LOVELLS CADWALADER US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
liam.phibbs@hlc.com
holden.steinhauer@hlc.com

*Attorneys for Plaintiffs California Regional Multiple Listing Service, Inc. and OneKey® MLS LLC*